985 A.2d 847

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Ricky Lee ALLSHOUSE, Jr., Appellant.**

Supreme Court of Pennsylvania.

Argued March 4, 2009.

Decided Dec. 29, 2009.

62

David B. Chontos, Chontos & Chontos, P.C., for Ricky Lee Allshouse, Jr.

Jeffrey D. Burkett, Jefferson County District Attorney's Office, for Commonwealth of Pennsylvania.

Jules Epstein, Kairys, Rudovsky, Messing & Feinberg, Philadelphia, Marissa Boyers Bluestine, Defender Association of Philadelphia, for Amicus Curiae Defender Association of Philadelphia.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, GREENSPAN, JJ.

## OPINION

Justice TODD.

Ricky Lee Allshouse, Jr. appeals the April 18, 2007 order of the Superior Court of Pennsylvania, which affirmed the judgment of sentence imposed by the Jefferson County Court of Common Pleas following his convictions of simple assault [1] and endangering the welfare of a child.[2] For the reasons set forth below, we affirm.

On May 20, 2004, Appellant and M.R. ("Mother") were arguing in the home they shared with their three children. Appellant was shouting from the living room, and Mother was in the kitchen. The couple's 7–month–old twin sons, J.A. and M.A., were in a playpen in the living room, and their 4–year–old daughter, A.A., was playing nearby. Mother's 8–year–old son, R.R., who also lived in the home, had already left for school. Mother reported to police that, at one point, she heard a "squeak" as Appellant sat on a recliner in the living room and, minutes later, she heard him get up from the recliner. She then heard J.A. crying. N.T. Trial, 9/19/05, at 46–47. As Mother ran to the living room, she passed Appellant, who was heading upstairs. Mother observed that A.A. was now in the playpen, holding J.A.'s head on her lap. When Mother picked up J.A., "his arm flopped backwards." *Id.* at 147. Mother took J.A. to the emergency room, where it was determined that he had suffered a spiral fracture to the right humerous caused by sharp and severe twisting of the arm.

Hospital officials immediately contacted Jefferson County Children and Youth Services ("CYS"), and CYS caseworker John Geist arrived at the hospital and spoke with Dr. Craig Burke, the emergency-room physician who treated J.A. Dr. Burke opined that the spiral fracture of J.A.'s arm indicated abuse. Geist then spoke with Mother, and advised her that J.A. would need to be removed from the family home pending investigation. Mother agreed that J.A. and his siblings would stay with their paternal grandparents.

1. 18 Pa.C.S.A. § 2701(a)(1).
2. 18 Pa.C.S.A. § 4304.

On May 27, 2004, Appellant suggested to Geist that "possibly [A.A.] had caused injury to [J.A.]." N.T. Hearing, 9/16/05, at 9.[3] Accordingly, that same day, Geist went to A.A.'s paternal grandparents' home to speak with A.A. Geist and A.A. sat and talked on the front porch of the house, while A.A.'s grandparents, siblings, and others were inside. During the interview, A.A. told Geist that Appellant had caused J.A.'s injury.[4] After his interview with A.A., Geist spoke with his supervisor, and the two agreed to arrange an evaluation of A.A. by Dr. Allen Ryen, a psychologist. Dr. Ryen interviewed A.A. on June 8, 2004, and during the interview, A.A. again implicated Appellant in J.A.'s injury.[5]

3. *See also* N.T. Trial, 9/19/05, at 128 (Geist testified that he spoke with Appellant on May 27, 2004, at which time Appellant stated that he believed A.A. had caused J.A.'s injury).

4. In response to direct examination by the district attorney, Geist described the events of the interview as follows:
    [Geist]: I had asked [A.A.] if she could remember her brother being hurt. She stated, yes, she did. I asked her if her other brother had caused the injury. She said no. I asked her if her mother caused it. She said no. I asked [her] if she caused it. She said no. I asked her if her father Ricky caused the injury. She got scared and kind of queasy and stated yes.
    Q: What did you physically observe to say she was afraid?
    [Geist]: She started shaking. Closed body language. She was looking around to see if anyone heard her statement.
    Q: All right. Go on.
    [Geist]: I asked her what she could recall, what happened to her brother. She stated that her father had done it. I asked her if she could remember how [J.A.] got the injury. She stated that—she put her hand on my arm and said [Appellant] grabbed her [sic] right above the elbow and pulled. I didn't get into much else with her because one of [Appellant's] brothers came outside, and she stopped talking.
    N.T. Hearing, 9/16/05, at 11.

5. Dr. Ryen recounted his interview with A.A. concerning the incident with J.A., in response to questioning by the district attorney, as follows:
    [Dr. Ryen]: I'm not sure I can give you a specific quote, but I said something like did something happen to your brother or something kind of open-ended like that.
    Q: And can you tell the Court—what happened from there after you asked that question?
    [Dr. Ryen]: She immediately said to me, "Daddy hurt him". And I asked her more about that. She proceeded to describe her father had been, quote, mad and, quote, grabbed and yanked [J.A.'s] arm.
    Q: Did she explain what she meant by those statements?

On June 11, 2004, Appellant was arrested and charged with aggravated assault, simple assault, endangering the welfare of a child, reckless endangerment, and harassment. On September 16, 2005, the trial court conducted a hearing pursuant to the Tender Years Hearsay Act ("TYHA"), 42 Pa.C.S.A. § 5985.1, to determine whether the statements given by A.A. to Geist and Dr. Ryen, admittedly hearsay, were admissible under the tender years exception to the hearsay rule.[6] Under the TYHA, certain out-of-court statements made by a child victim or witness may be admissible at trial if the child either testifies at the proceeding or is unavailable as a witness, and the court finds "that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability." 42 Pa.C.S.A. § 5985.1(a)(1).

> [Dr. Ryen]: I asked her what she meant, and, you know, I have a lot of properties in my office, and she demonstrated on the baby doll what she was talking about. And later on, I asked her some questions, and she had me demonstrate it on her. She was the baby doll, and I was the adult, and she showed me what I should do.
> Q: And was she leading you through it?
> [Dr. Ryen]: Yes.
> Q: Could you describe her demonstration to the Court?
> [Dr. Ryen]: Basically, you know, both. What she had me do was grab her by the elbow and kind of lift and twist at the same time. Kind of like that. She did that on the baby doll and instructed me if I went that way, it wasn't right. And I finally got it right.
> Q: And she told you that it was right?
> [Dr. Ryen]: Yes.
> Q: Did she describe at that point how the baby had reacted?
> [Dr. Ryen]: She said the baby began to cry and scream.
> Q. And what else did she describe about her physical observations at that time?
> [Dr. Ryen]: That the baby wouldn't stop crying; that father tried to pick the baby up and get the baby to quiet down, but he wouldn't quiet down. And that some time later on—I'm not certain if the mother was someplace in the house—sometime later on, the mother took the baby to the hospital.
>
> *Id.* at 31–32. In describing his interview, Dr. Ryen also noted that it was unusual that A.A. separated from her grandparents "without invitation" during the interview, and that after approximately ten minutes, A.A. was sitting on his lap and "kind of snuggling in." *Id.* at 29–30.

6. Rule 802 of Pennsylvania's Rules of Evidence provides: "Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802.

Analyzing the statements under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the trial court first noted that A.A.'s statements to Geist and Dr. Ryen fell "in between" testimonial and nontestimonial statements "because we do have some questioning." N.T. Hearing, 9/16/05, at 61. The court explained, however:

I'm going to find it's nontestimonial for these basis [sic]. I think we have to look at what an objective four-year-old of average intelligence would think. And Mr. Geist, as he appears today, he does not have on a uniform but carries a badge, but not a badge in the sense of police work.

Dr. Ryen has a psychological appointment in the office to believe that later these statements would be used in Court. I certainly do not think for this four-year-old that she could make the determination that it would be available for use later at trial.

*Id.* at 61–62. The trial court determined that A.A.'s statements to Geist and Dr. Ryen satisfied the requirements of the tender years exception to the hearsay rule, and, under *Crawford*, would be admissible at trial.

On September 19, 2005, Appellant filed a motion for reconsideration, asserting A.A.'s statements constituted testimonial hearsay that was inadmissible under *Crawford*. Following argument, the trial judge denied the motion, reiterating his opinion that, in determining whether questioning should be deemed testimonial in nature, "you have to look at it from the 4–year–old's point of view because the concern is reliability in that regard." N.T. Hearing, 9/19/05, at 3. On September 20, 2005, a jury convicted Appellant of simple assault and endangering the welfare of a child; he was acquitted of the remaining charges.

On November 2, 2005, Appellant was sentenced to one to two years in prison, plus fines, costs, and restitution. Appellant filed a post-sentence motion, and a hearing on the motion was held on January 12, 2006. On March 9, 2006, the trial court denied Appellant's motion to the extent he sought

judgment of acquittal on his child endangerment conviction.[7] On April 3, 2006, Appellant appealed his judgment of sentence to the Superior Court, challenging, *inter alia,* the trial court's admission of A.A.'s statements to Geist and Dr. Ryen at trial.

With regard to the issues presently before this Court, the Superior Court agreed with the trial court that A.A.'s statements to Geist were nontestimonial in nature, and thus admissible under *Crawford.* The Superior Court concluded, however, that it could not determine, based on the record, whether A.A.'s statements to Dr. Ryen were testimonial because "it is impossible to determine what Dr. Ryen's primary purpose was in conducting the interview." *Commonwealth v. Allshouse,* 924 A.2d 1215, 1224 (Pa.Super.2007). Nevertheless, the Superior Court opined that it was unnecessary to determine whether A.A.'s statements to Dr. Ryen were testimonial because, even if they were, admission of the statements was harmless error since Dr. Ryen's testimony was merely cumulative of other properly admitted testimony, and there was overwhelming "untainted evidence" to support the jury's verdict. *Id.* at 1224–25.

The Superior Court declined to address Appellant's additional argument that the trial court's application of the 2004 amended version of the TYHA, which provides that an out-of-court statement of a child victim or witness under age 12 is admissible at trial if, *inter alia,* the child is unavailable as a witness and the trial court determines the circumstances surrounding the statement provide sufficient indicia of reliability, violated the prohibition against ex post facto laws. The Superior Court determined that, even if it did, the trial court could have admitted A.A.'s statements as nontestimonial hearsay under *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), based on a finding that A.A.'s testimony contained particularized guarantees of trustworthiness. The Superior Court ultimately affirmed Appellant's judgment of sentence in a published opinion on April 18, 2007.

7. The trial court granted Appellant relief in reversing a restitution award of $160 payable to CYS.

Thereafter, Appellant filed a petition for allowance of appeal, and, on October 22, 2008, this Court granted Appellant's petition with respect to the following issues:

1. Does the Superior Court's decision conflict with U.S. Supreme Court precedent on the confrontation clause thereby creating a direct conflict with another Superior Court decision?

2. Did the Superior Court disregard this Court's harmless error precedent by allowing the Commonwealth to discharge its burden of proving harmless error through a two-sentence footnote?

3. Did the Superior Court decision misconstrue the reach of *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and thereby insulate Pennsylvania's Tender Years Hearsay Act from an *ex post facto* challenge?

*Commonwealth v. Allshouse*, 598 Pa. 600, 959 A.2d 903 (2008) (order). This Court heard oral argument in this matter on March 4, 2009.

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const., amend. VI. This constitutional protection is known as the Confrontation Clause.[8] In 1980, the United States Supreme Court, in *Ohio v. Roberts, supra,* held that the Confrontation Clause did not bar admission of an unavailable witness's statement against a criminal defendant, provided the statement was surrounded by "adequate indicia of reliability." 448 U.S. at 66, 100 S.Ct. 2531. Such indicia exist when the testimony being considered either fits within a "firmly rooted hearsay exception," or contains "particularized guarantees of trustworthiness." *Id.*

8. The protection is expressly contained in Article 1, Section 9 of the Pennsylvania Constitution. Although Appellant notes in his brief that "Pennsylvania's constitution has the same confrontation language [as *Crawford*]," Appellant's Brief at 27 n.8, he presents no argument based on Article 1, Section 9. Thus, we express no opinion as to whether Appellant would be entitled to relief thereunder.

More than two decades after its decision in *Roberts,* the Supreme Court, in *Crawford v. Washington, supra,* overruled its *Roberts* decision. In doing so, the *Crawford* Court criticized the *Roberts* "indicia of reliability" test as a departure from the principles of the Confrontation Clause in two respects:

> First, it is too broad: It applies the same mode of analysis whether or not the hearsay consists of *ex parte* testimony. This often results in close constitutional scrutiny in cases that are far removed from the core concerns of the Clause. At the same time, however, the test is too narrow: It admits statements that *do* consist of *ex parte* testimony upon a mere finding of reliability. This malleable standard often fails to protect against paradigmatic confrontation violations.

*Crawford,* 541 U.S. at 60, 124 S.Ct. 1354 (emphasis original). The *Crawford* Court explained that, while it had "no doubt that the courts below were acting in utmost good faith" when finding reliability,

> [t]he Framers . . . would not have been content to indulge this assumption. They knew that judges, like other government officers, could not always be trusted to safeguard the rights of the people; the likes of the dread Lord Jeffreys were not yet too distant a memory. They were loath to leave too much discretion in judicial hands. By replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to their design. Vague standards are manipulable, and, while that might be a small concern in run-of-the-mill assault prosecutions like this one, the Framers had an eye toward politically charged cases like Raleigh's-great state trials where the impartiality of even those at the highest levels of the judiciary might not be so clear. It is difficult to imagine *Roberts'* providing any meaningful protection in those circumstances.

*Id.* at 67–68, 124 S.Ct. 1354.

Accordingly, the *Crawford* Court held the Confrontation Clause prohibits out-of-court *testimonial* statements by a witness, regardless of whether the statements are deemed reli-

able by the trial court, unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. *Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.*

*Id.* at 68, 124 S.Ct. 1354 (emphasis added).

The *Crawford* Court expressly declined, however, to explain the distinction between testimonial and nontestimonial statements, stating "[w]e leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* (footnote omitted).

Two years after the Supreme Court's *Crawford* decision, the Court had the opportunity to clarify the difference between testimonial and nontestimonial hearsay in *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). At issue in the consolidated appeal [9] in *Davis* were two separate statements. The first was a statement made by a victim of spousal abuse to a 911 operator; the second was a wife's statement to police officers dispatched to investigate a domestic disturbance, set forth in a battery complaint. In finding the statement to the 911 operator nontestimonial,[10] but the

---

**9.** Davis' appeal was consolidated with the case of *Hammon v. Indiana,* 829 N.E.2d 444 (Ind.2005).

**10.** In determining that the recording of the 911 call was not testimonial evidence, the *Davis* Court noted:

> If 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers. For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police. As in *Crawford* ..., therefore, our holding today makes it

wife's statement to the police officers testimonial, the *Davis* Court set forth the following inquiries for determining whether statements are testimonial or nontestimonial:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822, 126 S.Ct. 2266. Thus, a statement is *nontestimonial* under the first *Davis* inquiry if it is made with the purpose of enabling police to meet an ongoing emergency. Conversely, a statement is *testimonial* under the second inquiry in *Davis* if: (1) it was made in absence of an ongoing emergency; and (2) the primary objective of the interrogation or questioning that resulted in the statement was to establish or prove past events. Collectively, these *Davis* inquiries are commonly referred to as the "primary purpose" test.

The Court acknowledged that the two inquiries described above were not exhaustive and did not address all possible scenarios—such as situations which do not involve interrogations—in which a determination of whether a statement is testimonial or nontestimonial is required, explaining:

> Our holding refers to interrogations because . . . the statements in the cases presently before us are the products of interrogations—which in some circumstances tend to generate testimonial responses. This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial. The Framers were no more willing to exempt from cross-examination volunteered testi-

unnecessary to consider whether and when statements made to someone other than law enforcement personnel are "testimonial." *Davis,* 547 U.S. at 823 n. 2, 126 S.Ct. 2266.

mony or answers to open-ended questions than they were to exempt answers to detailed interrogation.

*Id.* at 822 n. 1, 126 S.Ct. 2266.

After *Crawford* and *Davis,* however, courts have struggled with the vitality of *Roberts* with regard to *nontestimonial* hearsay. As noted above, the *Crawford* Court suggested that nontestimonial hearsay statements might be exempt "from Confrontation Clause scrutiny altogether." 541 U.S. at 68, 124 S.Ct. 1354. In *Davis,* the Court characterized *Roberts* as having been "overruled" and noted that the Confrontation Clause's focus on testimonial hearsay must be viewed as marking not merely its "core," but its perimeter. 547 U.S. at 824, 126 S.Ct. 2266. Lastly, and most emphatically, in *Whorton v. Bockting,* 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007), the Court, in addressing the retroactivity of the *Crawford* decision, explained: "*Crawford* overruled *Roberts* because *Roberts* was inconsistent with the original understanding of the meaning of the Confrontation Clause." 549 U.S. at 419, 127 S.Ct. 1173. Noting "*Crawford's* elimination of Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements," the Court sounded the death knell of *Roberts:*

Under *Roberts,* an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under *Crawford,* on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability.

*Id.* at 420, 127 S.Ct. 1173.

These expressions notwithstanding, a number of courts, including the Third Circuit Court of Appeals, continue to apply the *Roberts* standard to determine the admissibility of nontestimonial hearsay statements. *See, e.g., Albrecht v. Horn,* 485 F.3d 103, 134 (3d Cir.2007) (admissibility of nontestimonial evidence governed by *Roberts* ); *State v. Camacho,* 282 Conn. 328, 924 A.2d 99, 116 (2007) (stating that nontestimonial hearsay statements may still be admitted as evidence against

an accused in a criminal trial if they satisfy both prongs of the *Roberts* test); *U.S. v. Myton,* 224 Fed.Appx. 125, 129 (2d Cir.2007) (holding that the admissibility of nontestimonial, out-of-court statements are evaluated under the "two-part test" of *Roberts* ).

Nevertheless, in the instant case, Appellant concedes that the threshold question is whether the statements are testimonial, because, if the statements are nontestimonial, "the confrontation clause places no restriction on their introduction except for the 'traditional limitations upon hearsay evidence.'" Appellant's Brief at 35 (citing *Davis,* 547 U.S. at 821, 126 S.Ct. 2266). Thus, we turn to the merits of the issues on which we granted review.

Appellant first contends that the trial court, in admitting at trial the statements of A.A., who had not testified and was not cross-examined, violated his Confrontation Clause rights under *Crawford* and *Davis.* The trial court, in determining that A.A.'s statements to Geist and Dr. Ryen were nontestimonial,

> focused on the language quoted in *Crawford* that testimonial statements included those made under circumstances that would lead an objective witness reasonably to believe that his or her statement would be available for use at a later trial. The Court then concluded that an objective four-year-old of average intelligence and under the existing circumstances would not consider that her statements might later be used against [Appellant]. In fact, when he talked to [A.A.] on her own front porch, Geist was wearing blue jeans and never indicated to her his suspicions, the nature of his job, or her potential role as a witness against [Appellant]. Dr. Ryen also wore casual clothing and no badge of authority; he did not apprise [A.A.] of the purpose of their visit; and offered no indication that her statements could later be used in court. He then proceeded to engage [A.A.] in conversation and play that no typical four-year-old would interpret as being designed to elicit inculpatory information.

Trial Court Opinion, 5/5/06, at 4 (record citations omitted). We note that the trial court did not have the benefit of the

United States Supreme Court's decision in *Davis* at the time it authored its opinion, as *Davis* was decided on June 19, 2006.

The Superior Court did, however, have the benefit of *Davis*, and, in affirming the trial court's holding with respect to A.A.'s statement to Geist, opined that the language of *Davis*

implies that a number of factors must *all* be considered in determining whether a statement is testimonial; the use of the word "and" indicates that both prongs of the test must be satisfied before a statement can be considered testimonial. In satisfying the first half of the *Davis* test by determining whether the statement being examined was given during an ongoing emergency, only one factor needs to be examined—the temporal relation of the statement being examined to the wrong the statement describes.

Satisfying the primary purpose prong of the *Davis* test, in contrast, encompasses examination of two factors. The first factor that must be considered is the objective intent of the declarant and the objective intent of the questioner in giving and eliciting the statement being considered. Furthermore, the environment in which the statement was given, including the attendant formalities, must also be considered.... In sum, the Court's primary purpose test seems to be a variant of the totality of the circumstances test with parameters that are more specifically defined.

*Allshouse*, 924 A.2d at 1221 (citations omitted).

With regard to A.A.'s statements to Geist, the Superior Court then concluded:

Examining the facts and circumstances of this interview leads us to the conclusion that A.A.'s statements are admissible as non-testimonial under *Crawford*, should a hearsay exception prove applicable.[11] While we recognize Geist conducted the interview a full seven days after the assault,

11. The Superior Court did not determine that a specific hearsay exception applied; rather, as noted in our discussion of the trial court's admission of A.A.'s statement to Geist under the amended version of the TYHA, *infra*, it concluded that the trial court could have admitted A.A.'s statements under *Roberts* based on a finding that they contained particularized guarantees of trustworthiness.

the intentions of Geist and A.A. as well as the attendant environmental factors indicate A.A.'s statements are, indeed, non-testimonial in nature.

Presently, appellant does not dispute Geist's contention that he only wanted to interview A.A. after appellant accused the young girl of harming J.A., and it would be absurd to assume A.A. had intended to give statements for use in a legal proceeding. Geist's failure to interview A.A. when he had her under his [exclusive supervision and control when he first transported A.A. and her siblings to their grandparents' home] also indicates Geist's contention is credible and, hence, there is little question Geist's primary purpose in interviewing A.A. was not to establish past events which would be potentially relevant in a criminal trial, but to ensure both A.A. and her siblings' welfare was secure while they remained in the custody of her grandparents. In addition thereto, Geist did not report A.A.'s statements to law enforcement but, rather, notified his CYS supervisor of them after the interview, even though he had the option of reporting the incident to the police.

Furthermore, the environment surrounding the interview does not indicate A.A.'s statements were testimonial. As noted above, Geist was dressed casually and the interview was conducted on neutral ground. Additionally, Geist had no control over the interviewing environment—as his inquires were cut short after appellant's brother intervened. There was simply no semblance of formality during the interview.

In sum, we do not view the Supreme Court's primary purpose test as being reliant solely on the temporal relationship between the statement and the wrong the statement describes and, instead, view the test as encompassing the broader range of factors applied in *Davis*. Inasmuch as this is the case, we conclude Geist's testimony is nontestimonial.

*Allshouse*, 924 A.2d at 1222–23 (footnotes and citations omitted).

Predictably, Appellant contends that A.A.'s statements to both Geist and Dr. Ryen were testimonial under *Davis*. Ap-

pellant first asserts there was no ongoing emergency, as any emergency that existed ended with J.A.'s removal from the family home on May 20, 2004. Appellant further maintains that the questions posed to A.A. by Geist on May 27, 2004 "were solely designed to have the child witness recreate past events," and that the "purpose associated with Dr. Ryen's interview was 100% investigative and 0% medicinal." Appellant's Brief at 41, 42. Finally, Appellant avers that, to the extent the formality associated with a statement should be considered, the circumstances surrounding A.A.'s statement to Geist—specifically, the fact that Geist introduced himself to A.A., asked her permission to speak with her, and shook her hand—support a conclusion that the purpose of the interview was investigative. *Id.* at 43.[12]

As noted above, in considering whether A.A.'s statement to Geist was testimonial under *Davis,* the Superior Court considered the first of the two *Davis* inquiries—whether the statement was given during an ongoing emergency—and stated that it "recognize[d] Geist conducted the interview a full seven days after the assault." *Allshouse,* 924 A.2d at 1222. However, the court further noted that there was "some question as to whether A.A. was being abused in some way by her grandparents and other members of the family and, therefore, an argument could be made that an ongoing emergency was present." *Id.* at n. 15 (emphasis omitted).

**12.** A joint amicus brief was filed on behalf of Appellant by the Pennsylvania Association of Criminal Defense Lawyers, the Defender Association of Philadelphia, and the Public Defender Association of Pennsylvania (collectively, "Amici"). Amici argue that in applying the "primary purpose" test of *Davis,* a court is obligated to consider whether there existed "multiple primary purposes," and if even *one* of those purposes was to obtain information for use in a criminal investigation, the resulting statement must be deemed testimonial. Amicus Brief at 4. Amici further argue that "the structure of child witness interviewing in Pennsylvania and nationally demonstrates that forensic interviewing by nurses, social workers and medical personnel has the primary purpose of criminal investigation." *Id.* Finally, Amici maintain that "the test for excluding hearsay under *Crawford* and the Confrontation Guarantee does not vary with the age of the declarant." *Id.* at 5. In light of our determination that A.A.'s statement to Geist was nontestimonial under the first *Davis* inquiry, *see infra,* we do not address these arguments.

With regard to the second *Davis* inquiry, the Superior Court further concluded that A.A.'s statement to Geist was not testimonial because (a) Geist's intent during his interview with A.A. was not to obtain testimony for the purpose of a criminal proceeding, but to ensure the safety of J.A. and his siblings, and (b) the environment and circumstances surrounding A.A.'s statement were informal and not suggestive of an investigatory interview. Appellant, however, alleges that the Superior Court's application of the primary purpose test of *Davis* was flawed as a result of its "injection of the declarant's intent" into the factors considered under that test. Appellant's Brief at 54.

We conclude that A.A.'s statement to Geist was nontestimonial under *Davis* because it was given during an ongoing emergency. Specifically, we note that, although Appellant asserts that any ongoing emergency ended with J.A.'s removal from the family home on May 20, 2004, the validity of this assertion is premised on Appellant having caused J.A.'s injury. On May 27, 2004, however, Appellant told Geist that he believed A.A. had caused J.A.'s injury. N.T. Trial, 9/19/05, at 128. It was thus incumbent upon Geist to immediately investigate the matter further, because, at that time, A.A. and J.A. were together in their grandparents' home, where A.A. could do further harm to J.A. Indeed, Geist interviewed A.A. the same day that Appellant told Geist he believed A.A. caused J.A.'s injury.

We recognize that the first inquiry under *Davis* contemplates that nontestimonial statements are those made in order "to enable police assistance to meet an ongoing emergency," and that Geist is not a police officer. As previously noted, however, the *Davis* Court construed the acts of 911 operators to be acts of the police on the basis that, even if 911 operators were not themselves law enforcement officers, they "may at least be agents of law enforcement when they conduct interrogations of 911 callers." *Davis*, 547 U.S. at 823, 126 S.Ct. 2266. Similarly, we conclude that, in the instant case, Geist, who was contacted by hospital officials when J.A. was brought into the emergency room, and who was responsible

for ensuring the safety of J.A. upon J.A.'s removal from the family home, should be construed to be an agent of law enforcement for purposes of a *Davis* analysis. *Cf. Commonwealth v. Ramos*, 367 Pa.Super. 84, 532 A.2d 465, 468 (1987) (per curiam) (in determining that a defendant should have been given Miranda warnings prior to questioning, while in police custody, by a CYS agent, the court noted that in fulfilling its purpose of providing protection for children from abuse, "CYS is not only a treatment agency, but is the investigating arm of the statewide system of Child Protective Services."). Under these circumstances, we hold that A.A.'s statement to Geist was given in the context of an ongoing emergency, and thus, under *Davis*, was nontestimonial. In light of our conclusion that the Superior Court properly determined A.A.'s statement to Geist was given during an ongoing emergency, and, therefore, was nontestimonial under the first inquiry in *Davis*, we need not analyze A.A.'s statement under the second *Davis* inquiry, namely, whether the primary purpose of the interrogation was to establish or prove past events potentially relevant to later criminal prosecution.

We next consider whether A.A.'s statement to Dr. Ryen was testimonial under *Davis*. Unlike A.A.'s statement to Geist, we cannot conclude that A.A's statement to Dr. Ryen was given during an ongoing emergency, as Dr. Ryen's interview with A.A. took place on June 8, 2004, nearly two weeks after Appellant suggested to Geist that A.A. may have been responsible for J.A.'s injuries. While we would thus need to address the second *Davis* inquiry with respect to A.A.'s statement to Dr. Ryen, we do not because we agree, as the Superior Court opined, that any possible error in admitting A.A.'s statement to Dr. Ryen was harmless because the statement was merely cumulative of A.A.'s statement to Geist, which we have concluded was properly admitted.

It is well settled that "an appellate court has the ability to affirm a valid judgment or verdict for any reason appearing as of record." *Commonwealth v. Parker*, 591 Pa. 526, 534–35, 919 A.2d 943, 948 (2007) (citing *Commonwealth v.*

*Katze*, 540 Pa. 416, 658 A.2d 345 (1995) (Opinion in Support of Affirmance)). As we explained in *Commonwealth v. Thornton*,

> [t]he doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised on the well-settled proposition that "[a] defendant is entitled to a fair trial but not a perfect one."

494 Pa. 260, 266, 431 A.2d 248, 251 (1981). This Court may affirm a judgment based on harmless error even if such an argument is not raised by the parties.[13]

---

**13.** Appellant argues that the Superior Court improperly engaged in a harmless error analysis with regard to the admissibility of A.A.'s statement to Dr. Ryen because the Commonwealth failed to provide sufficient argument in support of a finding thereof. Specifically, Appellant avers that the Commonwealth's only mention of the concept of harmless error was contained in a two-sentence footnote in its brief to the Superior Court, Appellant's Brief at 74, and that the Commonwealth argued that any error in the admission of A.A.'s statement to Geist would be harmless error if A.A.'s statement to Dr. Ryen was deemed properly admitted because the statement given to Dr. Ryen was more detailed, and Geist's testimony would be cumulative of Dr. Ryen's testimony.

First, the discrepancy as to which statement was alleged to be cumulative of another is immaterial to the issue of whether the Superior Court improperly engaged in a harmless error analysis in the first instance. Furthermore, in *Commonwealth v. Katze*, 540 Pa. 416, 658 A.2d 345 (1995) (Opinion in Support of Affirmance), three Justices agreed that the Commonwealth did not waive its right to argue harmless error before the Superior Court by failing to first raise the issue before the trial court on the defendant's motion for a new trial:

> There is a general rule that issues not raised in the lower court may not be addressed on appeal; however, this rule is applicable only to appellants. The Commonwealth in the instant matter was not the appellant before the trial court, where the waiver is alleged to have occurred; therefore, it could not have waived any issues. Appellant cites several cases in support of its proposition that the Commonwealth waived its right to argue harmless error; however, in all of the cases cited, the party deemed to have waived an issue was the appellant. The Commonwealth, as the non-moving party before the trial court in the instant matter, had no obligation to preserve issues at the post-trial stage in the appeal process. Therefore, it was permitted to raise the issue of harmless error before the Superior Court.

We agree with the Superior Court that any error in the admission of A.A.'s statement to Dr. Ryen was harmless error because the statement was merely cumulative of the statement A.A. made to Geist. Indeed, the substance of A.A.'s statements to Dr. Ryen and Geist was the same: A.A. indicated to both Geist and Dr. Ryen that Appellant had hurt J.A. by grabbing and pulling on J.A.'s arm. Accordingly, Appellant is not entitled to relief based on his claim that A.A.'s statement to Dr. Ryen was improperly admitted.

■ Having determined that A.A.'s statement to Geist was nontestimonial under *Davis,* and thus not subject to the protections of the Confrontation Clause, we now address Appellant's argument that the trial court's admission of the statement as a hearsay exception under the current version of the TYHA constituted an ex post facto violation.[14] Instantly, the trial court found A.A.'s statements to Geist and Dr. Ryen admissible under the tender years hearsay exception. The current version of the TYHA, which became effective on July 15, 2004, provides:

> (a) General rule.—An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing any of the offenses enumerated in 18 Pa.C.S. Chs. 25 (relating to criminal homicide), 27 (relating to assault), 29 (relating to kidnapping), 31 (relating to sexual offenses), 35 (relating to burglary and other criminal intrusion) and 37 (relating to robbery), not otherwise admissible by statute or rule of

540 Pa. at 425, 658 A.2d at 349 (footnote and citation omitted). In the case *sub judice,* the Commonwealth was not the moving party before the trial court or the Superior Court, and, therefore, had no obligation to preserve any claim of harmless error. Moreover, it was within the Superior Court's discretion to affirm the judgment against Appellant for any reason. Accordingly, we reject Appellant's argument that the Superior Court erred in engaging in a harmless error analysis.

14. Appellant makes the same argument with respect to A.A.'s statement to Dr. Ryen, but as we have concluded that any error in admitting A.A.'s statement to Dr. Ryen was harmless, we need only address his claim concerning Geist. Regardless, the analysis *infra* applies to both statements.

evidence, is admissible in evidence in any criminal or civil proceeding if:

(1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2) the child either:

(i) testifies at the proceeding; or

(ii) is unavailable as a witness.

42 Pa.C.S.A. § 5985.1(a) (amended 2004).

At the time J.A. was injured in May 2004, however, the prior version of the TYHA was still in effect, and provided:

(a) General rule.—An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing physical abuse, indecent contact or any of the offenses enumerated in 18 Pa.C.S. Ch. 31 (relating to sexual offenses) *performed with or on the child by another,* not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal proceeding if:

(1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2) the child either:

(i) testifies at the proceeding; or

(ii) is unavailable as a witness.

42 Pa.C.S.A. § 5985.1(a) (2000) (emphasis added). The amended version thus eliminated the requirement that the offense be "performed with or on the child." Appellant argues that the trial court's admission at trial, under the amended version of the TYHA, of A.A.'s statements to Geist and Dr. Ryen, that did not describe abuse performed *with or on A.A.,* constituted a violation of the prohibition against ex post facto

laws contained in both the United States and Pennsylvania Constitutions.[15]

Preliminarily, we note that the ex post facto clauses of the United States and Pennsylvania Constitutions are virtually identical in language, and the standards applied to determine ex post facto violations under both constitutions are comparable. *Commonwealth v. Young*, 536 Pa. 57, 65 n. 7, 637 A.2d 1313, 1317 n. 7 (1993) (holding that analysis of the appellant's federal ex post facto claim disposed of his state claim as well). The ex post facto clause of the United States Constitution provides: "No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts...." U.S. Const. art. 1, § 10. The ex post facto clause of the Pennsylvania Constitution provides: "No *ex post facto* law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed." Pa. Const. art. 1, § 17.

A law violates the ex post facto clause of the United States Constitution if it (1) makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action; (2) aggravates a crime, or makes it greater than it was when committed; (3) changes the punishment, and inflicts a greater punishment than the law annexed to the crime when committed; or (4) alters the legal

15. Appellant, who was not charged with any sexual offenses, apparently interprets the phrase "performed with or on the child by another," as contained in the prior version of the TYHA, as modifying all the crimes listed. *See* Appellant's Brief at 63 ("The evidence, however, does not show any act by Allshouse which was 'performed with' or 'on the child' witness."). In the prior version of the TYHA, however, the phrase "performed with or on the child by another" arguably could be read to apply **only** to sexual offenses; under such a reading, the portion of the TYHA relevant to the instant case would have been the same under both versions of the TYHA, since both versions would have permitted out-of-court statements made by a child witness, age 12 or younger, describing physical abuse. In that (1) the Commonwealth does not challenge Appellant's argument in this regard; (2) the prior version of the TYHA is no longer in effect; and (3) we conclude, for the reasons discussed *infra*, that application of the amended version of the TYHA does not violate the prohibition against ex post facto laws regardless, it is unnecessary for us to engage in a statutory construction analysis to determine whether Appellant's interpretation is correct.

rules of evidence, and receives less, or different, testimony than the law required at the time of the commission of the offense in order to convict the offender. *Carmell v. Texas,* 529 U.S. 513, 522, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000) (citing *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798)); *Young,* 536 Pa. at 65–66, 637 A.2d at 1317 (assertion of an ex post facto violation based on the third prong of *Calder* ).

Appellant maintains that application of the amended version of the TYHA in his case violated the fourth *Calder* prong because "[t]he evidence received at trial was *different* than what would have been received back in May, 2004." Appellant's Brief at 71 (emphasis original). In denying Appellant relief on his ex post facto claim, the Superior Court reasoned:

The trial court, by applying the [TYHA] to the current controversy, was required to find A.A. was unavailable and was also required to find indicia of reliability. 42 Pa.C.S.A. § 5985.1. The record demonstrates the indicia of reliability ultimately found by the trial court was not the Tender Years Hearsay Act itself, in accordance with the aspect of the *Roberts* definition that allows reliability to be found in a "firmly rooted hearsay exception."

[Rather], the trial court's finding of reliability, which was not in the form of a "firmly rooted hearsay exception" and was premised on a finding of "particularized guarantees of trustworthiness," satisfies *Roberts,* which was binding precedent when appellant was charged and remains binding precedent in analyzing the admission of non-testimonial hearsay today. Thus, even if we assume arguendo the trial court's application of the Act constitutes an *ex post facto* violation, this application is inconsequential, as the trial court simply could have applied *Roberts* and reached the identical result. There is no reason to reverse and remand, as the trial court could simply reach the same result by stating that it is applying *Roberts.*

*Commonwealth v. Allshouse,* 924 A.2d at 1226–27 (footnote omitted). We hold that Appellant is not entitled to relief on

the basis of his ex post facto claim, albeit for different reasons than relied upon by the Superior Court.[16]

The United States Supreme Court addressed the issue of ex post facto laws regarding rules of evidence in *Hopt v. Utah*, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884). In *Hopt*, the appellant committed a murder at a time when the law precluded a particular class of witnesses—namely, convicted felons—from testifying at trial. By the time of the appellant's trial, however, this law had been repealed, and the trial court allowed a witness who was incarcerated on murder charges to testify at the appellant's trial. In holding there was no violation of the prohibition against ex post facto laws, the Court stated:

Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not attach criminality to any act previously done, and which was innocent when done, nor aggravate any crime theretofore committed, nor provide a greater punishment therefore than was prescribed at the time of its commission, nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed. The crime for which the present defendant was indicted, the punishment prescribed therefore, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute. Any statutory alteration of the legal rules of evidence which would

**16.** The Superior Court, in concluding that A.A.'s statements were admissible as nontestimonial hearsay under *Roberts* based on the trial court's finding that the testimony contained particularized guarantees of trustworthiness, did not recognize that, even if A.A.'s statements were admissible on this basis under federal constitutional law, the statements might nonetheless be inadmissible under Pennsylvania's rules of evidence, which rules prohibit the admission of hearsay "except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802. As a result of our conclusion that the trial court's application of the amended TYHA did not violate the ex post facto clause of either the United States or Pennsylvania Constitution, however, we need not address this matter further.

authorize conviction upon less proof, in amount or degree, than was required when the offense was committed, might, in respect of that offense, be obnoxious to the constitutional inhibition upon *ex post facto* laws. But alterations which do not increase the punishment, nor change the ingredients of the offense or the ultimate facts necessary to establish guilt, but-leaving untouched the nature of the crime and the amount or degree of proof essential to conviction-only removes existing restrictions upon the competency of certain classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the state, upon grounds of public policy, may regulate at pleasure. Such regulations of the mode in which the facts constituting guilt may be placed before the jury can be made applicable to prosecutions or trials thereafter had, without reference to the date of the commission of the offense charged.

*Hopt,* 110 U.S. at 589–90, 4 S.Ct. 202.

Similarly, in *Thompson v. Missouri,* 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898), the appellant alleged an ex post facto violation when evidence consisting of a handwriting comparison, which was inadmissible at the time the crime was committed and at the appellant's first trial, was used in a second trial at which the appellant ultimately was convicted. The Supreme Court rejected the appellant's argument using language similar to that used in *Hopt:*

[W]e adjudge that the statute of Missouri relating to the comparison of writings is not *ex post facto* when applied to prosecutions for crimes committed prior to its passage. If persons excluded upon grounds of public policy at the time of the commission of the offense, from testifying as witnesses for or against the accused, may, in virtue of a statute, become competent to testify, we cannot perceive any ground upon which to hold a statute to be *ex post facto* which does nothing more than admit evidence of a particular kind in a criminal case upon an issue of fact which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offense was committed. The Missouri

statute, when applied to this case, did not enlarge the punishment to which the accused was liable when his crime was committed, nor make any act involved in his offense criminal that was not criminal at the time he committed the murder of which he was found guilty. It did not change the quality or degree of his offense. Nor can the new rule introduced by [it] be characterized as unreasonable; certainly not so unreasonable as materially to affect the substantial rights of one put on trial for crime. The statute did not require "less proof, in amount or degree," than was required at the time of the commission of the crime charged upon him. It left unimpaired the right of the jury to determine the sufficiency or effect of the evidence declared to be admissible, and did not disturb the fundamental rule that the state, as a condition of its right to take the life of an accused, must overcome the presumption of his innocence, and establish his guilt beyond a reasonable doubt.... The statute did nothing more than remove an obstacle arising out of a rule of evidence that withdrew from the consideration of the jury testimony which, in the opinion of the legislature, tended to elucidate the ultimate, essential fact to be established, namely, the guilt of the accused.... We cannot adjudge that the accused had any vested right in the rule of evidence which obtained prior to the passage of the Missouri statute, nor that the rule established by that statute entrenched upon any of the essential rights belonging to one put on trial for a public offense.

*Thompson*, 171 U.S. at 386–88, 18 S.Ct. 922.

Most recently, in *Carmell, supra*, the Supreme Court considered an ex post facto challenge to a Texas law, an amendment to which altered the rules of evidence for crimes committed prior to the amendment. The appellant in *Carmell* was convicted in 1996 on 15 counts of committing sexual offenses against his stepdaughter. The offenses were committed between 1991 and 1995, when the victim was between 12 and 16 years old. Prior to September 1, 1993, Art. 38.07 of the Texas Code of Criminal Procedure specified that a victim's testimony regarding a sexual offense could not support a conviction

unless (1) corroborated by other evidence or (2) the victim informed another person of the offense within six months of its occurrence (an "outcry"). However, if the victim was under age 14 at the time of the offense, the victim's testimony alone could support a conviction. The original version of Article 38.07 read:

A conviction under Chapter 21, Section 22.011, or Section 22.021, Penal Code, is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within six months after the date on which the offense is alleged to have occurred. The requirement that the victim inform another person of an alleged offense does not apply if the victim was younger than 14 years of age at the time of the alleged offense.

*Carmell,* 529 U.S. at 517, 120 S.Ct. 1620, quoting Tex.Code Crim. Proc. Ann., Art. 38.07 (1983). Subsequently, a 1993 amendment to the code of criminal procedure allowed a conviction based on the victim's testimony alone if the victim was under age 18.

Carmell appealed his convictions on four of the counts, arguing that the convictions could not stand under the pre–1993 version of the law in effect at the time the crimes were committed because the convictions were based solely on the testimony of the victim, who was not under 14 at the time of the offenses and had not made a timely outcry. The Texas Court of Appeals, citing *Hopt, supra,* held that applying the 1993 amendment retroactively did not violate the ex post facto clause of the United States Constitution because it did not increase the punishment or change the elements of the offense the state had to prove; rather, it merely removed certain restrictions on the competency of certain classes of persons as witnesses, and, thus, was simply a rule of procedure. *Carmell,* 529 U.S. at 520, 120 S.Ct. 1620. Recognizing a conflict in decisions regarding the retroactive application of a statute repealing a corroboration requirement, the United States Supreme Court granted review, and, in a 5–4 decision, reversed the Texas Court of Appeals.

The Court first emphasized that "Texas courts treat Article 38.07 as a sufficiency of the evidence rule, rather than as a rule concerning the competency or admissibility of evidence." *Id.* at 518 n. 2, 120 S.Ct. 1620. After acknowledging the four categories of ex post facto laws set forth in *Calder* and discussed above, the Court noted that a law that alters the legal rules of evidence, and allows for the receipt of less, or different testimony than the law required at the time of the commission of the offense in order to convict the offender, constitutes the fourth type of ex post facto law set forth in *Calder.* With respect to the merits of the case before it, the Court concluded:

Article 38.07 is unquestionably a law "that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." Under the law in effect at the time the acts were committed, the prosecution's case was legally insufficient and petitioner was entitled to a judgment of acquittal, unless the State could produce both the victim's testimony and corroborative evidence. The amended law, however, changed the quantum of evidence necessary to sustain a conviction; under the new law, petitioner could be (and was) convicted on the victim's testimony alone, without any corroborating evidence. Under any commonsense understanding of *Calder's* fourth category, Article 38.07 plainly fits. Requiring only the victim's testimony to convict, rather than the victim's testimony plus other corroborating evidence is surely "less testimony required to convict" in any straightforward sense of those words.

*Carmell,* 529 U.S. at 530, 120 S.Ct. 1620 (emphasis omitted).

After careful consideration, we find *Carmell* distinguishable, and we conclude that the amended version of the TYHA at issue in the instant case is more akin to the laws challenged in *Hopt* and *Thompson,* and we conclude, as did the Supreme Court in those cases, that application of the amended version of the TYHA does not constitute a violation of the United States or Pennsylvania ex post facto clauses. The TYHA is

not a sufficiency rule, as it does not address the type of evidence sufficient to support a conviction. Unlike the amendment to Art. 38.07 of the Texas Code of Criminal Procedure challenged in *Carmell,* which altered the specific requirement that the State produce evidence of both the victim's testimony and corroboration *in order to convict* a defendant, the amended version of the TYHA in the instant case did not alter the evidence the Commonwealth was required to prove in order to convict Appellant. A.A.'s testimony, though potentially helpful, was not an essential element of the Commonwealth's case against Appellant. Indeed, evidence consisting of the testimony of Mother and the emergency room physician, though circumstantial, arguably was sufficient to support Appellant's conviction. The amended version of the TYHA simply *expanded* the class of persons whose out-of-court statements are admissible in court, from a victim or witness, age 12 or younger, on or with whom an offense was performed by another, to a victim or witness, age 12 or younger. In eliminating the requirement that the offense had to be performed "with or on the child by another," the amended version of the TYHA "simply enlarge[d] the class of persons who may be competent to testify in criminal cases." *Hopt,* 110 U.S. at 589, 4 S.Ct. 202. Unlike in *Carmell,* the amendment did not allow Appellant to be convicted on less, or different evidence.[17]

17. *See, e.g., Commonwealth v. McElhenny,* 329 Pa.Super. 240, 478 A.2d 447 (1984), wherein the Pennsylvania Superior Court relied on both *Hopt* and *Thompson* to reject the appellant's challenge to the sentence imposed after he was convicted of third-degree murder. Appellant argued that the admission of certain evidence at trial, namely, a tape recording of a 911 telephone call made by the appellant in which he made incriminating statements, violated the ex post facto clause of the United States and Pennsylvania Constitutions. Under the law at the time the call was recorded, the recording, although legally made, could not be used as evidence in court, absent the appellant's written consent. By the time of trial, however, that law had been repealed, and a new law, under which the recording was admissible irrespective of the appellant's consent, was in effect.

In rejecting the appellant's ex post facto claim, the Superior Court acknowledged that the law in question altered the legal rules of evidence to allow the admission of different evidence, but emphasized that the law did not alter the evidence necessary to *convict* the offender. That is, it did not change the legal definition of the crime; it did not change the prohibited behavior or what the state had to show to prove

Thus, we reject Appellant's argument that the trial court's admission at trial of A.A.'s statement to Geist violated the prohibition against ex post facto laws.

For all of the reasons set forth above, we affirm the order of the Superior Court.

Justice McCAFFERY did not participate in the consideration or decision of this case.

Chief Justice CASTILLE and Justices SAYLOR and EAKIN join the opinion.

Justice SAYLOR files a concurring opinion in which Chief Justice CASTILLE joins.

Justice BAER files a concurring opinion in which Justice GREENSPAN joins.

Justice SAYLOR, concurring.

I join the majority opinion.

My only addition is to highlight the tension between the testimonial litmus of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and the plain terms of the Sixth Amendment. *See* U.S. CONST., amend. VI ("In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him"). The many open questions in the wake of the immense shift in Confrontation Clause jurisprudence heralded by *Crawford* leaves lower-tier federal courts and state courts in a difficult position in terms of predicting the appropriate limits of this critical Sixth Amendment provision, as newly construed. *Accord* Michael H. Graham, 30B FED. PRAC. & PROC. EVID. § 7033 (2009).

I credit the majority opinion for doing the best job possible in such circumstances.

Chief Justice CASTILLE joins this concurring opinion.

the commission of the crime. That must be the focus of our enquiry and it did not occur here.
*Id.* at 449 (internal citation omitted, emphasis original).

Justice BAER, concurring.

I join the Majority with the exception of the following points. The Majority applies the primary purpose test from *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), to conclude that because Geist, a social worker, was confronting an ongoing emergency when he interviewed Appellant's four-year old daughter, A.A., the statements elicited from A.A. are nontestimonial. While I agree that the statements elicited from A.A. are nontestimonial, my conclusion derives from my belief that, in this context, we should not consider Geist an agent of law enforcement. Because I do not view him as an agent of law enforcement, I find it unnecessary to consider whether he was investigating an ongoing emergency.

The resolution of the admissibility of A.A.'s statements to Geist turns on whether her statements are testimonial. To make this determination we must consider the explanation of testimonial statements in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *Davis*. In *Crawford*, following the arrest of the defendant, police detectives interrogated him and his wife and obtained their statements regarding an earlier stabbing. The question before the Supreme Court was whether, when the wife refused to testify at the defendant's trial, the state could introduce her statement to police to contradict the defense. The defendant argued that admission of his wife's statement, absent her testimony, violated the Sixth Amendment's Confrontation Clause, which guarantees the accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Addressing this argument, the Court reviewed the original meaning of the Confrontation Clause and concluded that its history suggested two inferences. *Id.* at 50, 124 S.Ct. 1354.

First, that the principal evil at which the Confrontation Clause was directed was a specific form of hearsay deriving from criminal procedure in civil-law countries: *ex parte* examinations of witnesses by justices of the peace and other officers eventually introduced as evidence against the accused. Consequently, the Court noted that not all hearsay implicates the

Sixth Amendment's core concerns. *Id.* at 51, 124 S.Ct. 1354. Rather, the text of the Confrontation Clause applies to "witnesses" against the accused—witnesses being "those who bear testimony." *Id.* at 51, 124 S.Ct. 1354 (citing 2 N. Webster, An American Dictionary of the English Language (1828)). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* According to the Court, various formulations of this core class of "testimonial" statements exist:

> [E]x *parte* in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially ... statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.... Regardless of the precise articulation, some statements qualify under any definition-for example, *ex parte* testimony at a preliminary hearing.

*Id.* at 51–52, 124 S.Ct. 1354 (citations omitted). The Court further noted that the "[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse ..." *Id.* at 56, n. 7, 124 S.Ct. 1354. The Court found that unsworn statements taken by police officers in the course of interrogations are testimonial under even a narrow standard. *Id.* at 52, 124 S.Ct. 1354.

The second inference suggested by the history of the Confrontation Clause was that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination. *Id.* at 53–54, 124 S.Ct. 1354. The *Crawford* Court ultimately held that the defendant's wife's statements made during a police interrogation were testimonial hearsay that could not be admitted at the defendant's trial unless the declarant was

unavailable and the defendant had a prior opportunity to cross examine her. *Id.* at 68, 124 S.Ct. 1354.[1]

Finding a statement testimonial is, therefore, pursuant to *Crawford,* a threshold determination in assessing the statement's admissibility, triggering the demands of the Confrontation Clause. Although the Court left for another day any effort to spell out a comprehensive definition of "testimonial," *id.* at 68, 124 S.Ct. 1354, it identified certain statements as the functional equivalent of *"ex parte* in-court testimony": those provided in affidavits, *id.* at 51, 124 S.Ct. 1354; depositions, *id.* at 52, 124 S.Ct. 1354; those given during police interrogations, *id.* at 68, 124 S.Ct. 1354; prior testimony at a preliminary hearing, before a grand jury, or at a former trial, *id.* at 68, 124 S.Ct. 1354; or similar "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . ." *id.* at 52, 124 S.Ct. 1354.[2] In this core class of testimonial statements, the declarant reasonably believes that he is bearing testimony against the accused for use in a subsequent proceeding. In contrast, nontestimonial hearsay statements are not inadmissible in accord with the constraints of the Confrontation Clause because the declarant does not intend to bear testimony against the accused.

Although the Court in *Crawford* indicated that all statements made during police interrogations are testimonial, 541 U.S. at 52, 124 S.Ct. 1354, the Court was asked to reconsider this absolute characterization in *Davis* and *Hammon v. Indiana,* the companion case. In *Davis,* the declarant provid-

1. The Court overruled *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which conditioned the admissibility of all hearsay evidence on whether it fell under a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Crawford,* 541 U.S. at 60, 124 S.Ct. 1354. The Court found that this test was, in certain circumstances, too broad, because it applied the same analysis regardless of whether the hearsay consisted of *ex parte* testimony, thereby requiring close constitutional scrutiny of nontestimonial statements far removed from the core concerns of the Confrontation Clause.

2. Commentators have referred to this definition as the "objective-witness test." *See, e.g.,* Christopher Cannon Funk, *The Reasonable Child Declarant After Davis v. Washington,* 61 Stan. L.Rev. 923 (2009).

ed statements to a 911 operator, and in *Hammon*, the declarant made statements to police who responded to a reported domestic disturbance at her home. The Court was called upon to decide whether the statements made in these two circumstances were testimonial and thus subject to the requirements of the Confrontation Clause. The Court distinguished between nontestimonial and testimonial statements made during police interrogation:

> Without attempting to produce an exhaustive classification of all conceivable statements-or even all conceivable statements in response to police interrogation-as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822, 126 S.Ct. 2266.[3] The *Davis* Court assumed that the acts of the 911 operator were the acts of the police, making it unnecessary to decide whether and when statements made to someone other than law enforcement personnel are testimonial. *Id.* at 823, n. 2, 126 S.Ct. 2266.

Applying the above test to the facts of the two cases before it, the Court ultimately concluded that statements to the 911 operator in *Davis* were nontestimonial because they were provided during police interrogation to meet an ongoing emergency. The Court found, however, that the statements to police investigating a crime in *Hammon* were, in fact, testimonial, because they were provided as part of an investigation

---

3. Commentators have referred to this standard as the "primary purpose test." *The Reasonable Child*, 61 Stan. L.Rev. at 935.

If the primary purpose is to meet an ongoing emergency, the statement is nontestimonial; if there is no ongoing emergency and the primary purpose is instead to establish past events, then the statement is testimonial. *Davis*, 547 U.S. at 822, 126 S.Ct. 2266.

into possibly criminal past conduct. *Id.* at 829, 126 S.Ct. 2266. In reaching this conclusion, the Court indicated that formality is essential to testimonial utterance, *id.* at 830, n. 5, 126 S.Ct. 2266, noting that after the declarant in *Hammon* provided her statements to the police, she executed an affidavit to establish the past events. *Id.* at 832, 126 S.Ct. 2266.

The test provided in *Davis*, which requires a determination of the primary purpose of the police interrogation that produced the statements sought to be admitted, is limited on its face to police interrogations; the primary purpose test has no application to statements that are not made in the course of police interrogations. *See Davis*, 547 U.S. at 822, 126 S.Ct. 2266. If statements are made to someone other than law enforcement, we should look to the principals of *Crawford* to determine the testimonial nature of the statements. *See, e.g., State v. Stahl*, 111 Ohio St.3d 186, 855 N.E.2d 834 (2006) (applying *Crawford's* "objective witness" test, rather than *Davis's* "primary purpose" test, to find that statements made by an adult rape victim to a nurse practitioner were nontestimonial).

Although the primary purpose test easily classifies some statements as testimonial, its use is more problematic in the context of child abuse cases, which usually involve law enforcement, social workers, health care professionals, counselors, and family or friends. In fact, the difficulty of determining the testimonial nature of a statement obtained in a child abuse case contrasts with the relatively straightforward application of *Crawford* and *Davis* to police interrogations. Accordingly, I would not automatically determine that statements made by a child during the course of a child abuse investigation are testimonial unless made during an ongoing emergency solely due to the involvement of a government agent in the interview process. *See, e.g., People v. Vigil*, 127 P.3d 916, 923–25 (Colo.2006) (finding that a doctor working for a child protection team who obtained statements from a child was not a government agent "absent a more direct and controlling police presence"); *State v. Bobadilla*, 709 N.W.2d 243 (Minn.2006) (holding that the question of whether statements made by a

young child to a child protection worker are testimonial does not hinge on whether the worker was a government agent, but rather on whether the government agent was acting to a "substantial degree" to produce statements for trial). I believe that in the absence of police interrogation, our inquiry should examine the extent to which the questioner is acting at the behest of or in conjunction with law enforcement. In this regard, an important consideration in this case is the degree of police involvement in procuring the statements from A.A.

Before looking at the facts of this case, however, it is helpful to understand how Geist's interview came about pursuant to the Child Protective Services Law, 23 Pa.C.S. §§ 6301 *et seq.* The Law's purpose is to involve law enforcement agencies in responding to child abuse, to establish children and youth social service agencies to investigate reports of abuse, to provide protection for children from further abuse, and to provide rehabilitative services for the children and parents involved. 23 Pa.C.S. § 6302(b). The Law requires certain individuals to report suspected abuse, including physicians. 23 Pa.C.S. § 6311(b). Once a report of suspected abuse is received, the county CYS must commence an investigation, which includes a determination of the risk of harm to the child or children if they continue to remain in the home environment, as well as a determination of the nature, extent, and cause of any abuse, and to take any action necessary to provide for the safety of the child or children. 23 Pa.C.S. § 6368. Although CYS workers may release information to the police, there is no requirement that they do so. *See* 23 Pa.C.S. §§ 6339 and 6340.

Turning to the facts of this case, the circumstances reveal that the police were not involved in procuring A.A.'s statements to Geist. After Appellant injured his seven-month old son, J.A., the infant was treated at the hospital. The treating physician, who suspected physical abuse, contacted CYS social worker Geist. Geist responded to the hospital, where he interviewed J.A.'s mother, and concluded that J.A. and his siblings, including four-year-old A.A., should be removed temporarily for their safety. The children were placed with

Appellant's parents. Appellant informed Geist that A.A. caused J.A.'s injury. Acting on this information, Geist arrived at Appellant's parents' home to talk to A.A. on May 27, 2004, a week after the children's removal from their parents' care. Geist intended to obtain information regarding J.A.'s injury. Geist was causally dressed, and did not indicate that A.A.'s statements would be used in a subsequent proceeding against Appellant. He questioned her on the front porch, and asked her how she was and if she remembered what happened to J.A. She said that she did; Geist asked if J.A.'s twin caused the injury, and A.A. said no. He asked in turn whether A.A. caused the injury, whether her mother did, and whether her father did. When the questioning turned to her father, Appellant, A.A. began to act scared, and answered in the affirmative. She described Appellant as angry at the time, and demonstrated how the injury occurred. When one of Appellant's siblings interrupted, the interview ended. Geist returned to CYS, followed statutory procedure by notifying his supervisor, and recommended that A.A. be interviewed by Dr. Ryen. *See* 23 Pa.C.S. § 6311. He did not report his findings to law enforcement.

I do not believe that Geist was acting at the behest of or in conjunction with law enforcement. Police were not involved in Geist's interview of A.A., either formally or behind the scenes. There is no evidence that the police requested Geist's interview of A.A., provided any direction about the questioning, or had any input whatsoever. As the Superior Court noted, Geist did not notify the police of what he learned from his interview of A.A. Rather, he contacted his supervisor. Geist was acting pursuant to a statutory duty to ensure the safety of A.A. and her siblings.

The Majority presently applies the primary purpose test to the interrogation conducted by Geist, explaining such application by construing Geist to be an agent of law enforcement. To reach this conclusion, the Majority relies on *Commonwealth v. Ramos*, 367 Pa.Super. 84, 532 A.2d 465, 468 (1987). I find *Ramos* distinguishable on its facts. In *Ramos*, a CYS caseworker obtained a confession from a defendant during an

interview while the defendant was in prison awaiting trial on criminal charges for the child abuse that prompted the CYS interview. *Ramos*, 532 A.2d 465. The Superior Court found that the defendant's inculpatory statements to the CYS worker were inadmissible because they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Id.* The CYS caseworker interviewed the defendant, in jail, and there was no dispute regarding the custodial nature of the interrogation. Accordingly, the Superior Court properly concluded that the CYS worker in *Ramos* was assisting the police in investigating a crime.

The role of Geist in this case is distinguishable. Geist interviewed A.A. out of concern for the plight of Appellant's children. He was not involved in the criminal case against Appellant. His questioning was not intended to make the case against Appellant. Moreover, the status of the individual questioning the defendant is but one consideration into whether a statement was given during a custodial interrogation. *Commonwealth v. McGrath*, 504 Pa. 103, 470 A.2d 487 (1983) ("The determination of whether statements were elicited at a custodial interrogation must be made in light of the totality of circumstances involved, and the status of the questioner is only one of the relevant circumstances.").

Where law enforcement is not involved, the primary purpose test does not apply and an emergency is not a prerequisite to finding the statements nontestimonial. Because Geist was not acting as an agent of law enforcement, the primary purpose test does not apply. Rather, we should look to *Crawford's* core class of testimonial statements to determine whether the statements at issue here qualifies as the functional equivalent of "*ex parte* in-court testimony," *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354, and are therefore testimonial. Because we are not concerned here with statements provided in affidavits, depositions, during police interrogations, or prior testimony at a preliminary hearing, before a grand jury, or at a former trial, the remaining formulation of *Crawford's* core class of testimonial statements is the objective witness test. This test asks whether statements were made under circum-

stances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. *Id.* at 52, 124 S.Ct. 1354.

Considering all of the circumstances of Geist's interview, an objective person in A.A.'s position would not reasonably have anticipated that her statements might be used in a later prosecution of Appellant. There is no evidence that Geist elicited A.A.'s statements to preserve them for trial. The lack of formality connected with the interview would have objectively indicated to A.A. that she was not "bearing testimony" against Appellant. An objective witness could have reasonably believed that her statement to Geist was made to ensure the children's safety.

I conclude that A.A.'s statements were nontestimonial because they were provided to Geist, who was not acting as a law enforcement officer. In contrast, the Majority concludes that the child's statements are nontestimonial because, although Geist was acting as law enforcement, the primary purpose of his interview was to meet an ongoing emergency. I recognize that my disagreement with the Majority may appear to be a minor, nuanced point. However, I am wary of the implications of concluding that Geist was acting as an agent of law enforcement in this context. Specifically, construing the CYS worker as law enforcement because he was contacted by the hospital and was responsible for J.A.'s safety makes the admissibility of A.A.'s statements contingent on whether there was an ongoing emergency. As explained above, I do not believe that there is such a requirement under *Crawford.*

Justice GREENSPAN joins this opinion.