COMMONWEALTH of Pennsylvania,
Appellee

v.

William LEAK, Appellant.

Superior Court of Pennsylvania.

Submitted April 12, 2010.
Filed March 23, 2011.
Reargument Denied May 23, 2011.

Mark D. Mungello, Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: DONOHUE, SHOGAN and LAZARUS, JJ.

OPINION BY DONOHUE, J.:

Appellant, William Leak ("Leak"), appeals from the trial court's September 26, 2008 judgment of sentence. We affirm.

On June 27, 2008, a jury found Leak guilty of rape, involuntary deviate sexual intercourse, aggravated assault, aggravated indecent assault, unlawful restraint, and possession of an instrument of crime.[1] Subsequently, the trial court found Leak to be a sexually violent predator, and sentenced him to an aggregate 10 to 20 years of incarceration followed by 30 years of probation.

Leak's convictions are based on the following facts, as recited in the trial court's Pa.R.A.P. 1925(a) opinion:

On August 28, 2005, [Leak] went into an apartment at 3412 Kensington Avenue in Philadelphia to buy crack cocaine. That apartment was being rented by Laverna Devlin ['Devlin']. Quianna Martin ['Martin'], the Complainant, had been staying at the apartment with [Devlin] for three (3) to four (4) days recovering from an illness. Upon awakening, [Martin] heard [Devlin] and

---

1. 18 Pa.C.S.A. §§ 3121, 3123(a), 2702(a)(4), 3125, 2902, 907(b).

[Leak] arguing. When [Martin] entered the room, [Leak] grabbed [Martin's] left wrist and put a six (6) to eight (8) inch knife to her throat.

[Leak] motioned to [Martin] that he wanted oral sex and started to take off his pants. [Devlin] was telling [Leak] that she had 'more stuff' and to leave [Martin] alone. [Leak] told [Devlin] that he did not want more crack. [Leak] took down his pants and pushed [Martin's] head into his crotch and put his penis into [Martin's] mouth. [Leak] did not ejaculate.

[Leak] then sat on a couch and pulled [Martin] down next to him. [Devlin] ran out of the apartment. [Leak] forced [Martin] to engage in oral sex again, while he was sitting on the couch with his arm around her and with the knife in his hand. While [Leak] was holding [Martin], he lit a glass pipe that was in his mouth and burned [Martin's] neck.

An unknown male came to the door of the apartment with a bag of 'white stuff,' telling [Leak] that if he let [Martin] go, he would give the bag to [Leak]. [Leak] walked over to the male, dragging [Martin] along with the knife against her throat and pushed the male out of the doorway.

[Leak] told [Martin] to take off her clothes and to lie down on her back. [Leak] stuck a finger into [Martin's] vagina, removed a tampon from her vagina and had sexual intercourse with [Martin].

Police arrived on the scene, knocked on the door and entered the apartment. [Leak] told [Martin] to get dressed. One of the police officers drew his gun and told [Leak] to drop the knife. [Leak] screamed, 'we're all going to die today'; 'if you shoot me, we're all going to die'; 'I will kill her and you.' [Leak] continued pushing the knife to [Martin's] throat. [Martin] put her hand in between her throat and the knife and received a cut on three (3) fingers of her right hand. The Police backed out of the apartment. While outside the apartment, the Police broke a window in the apartment and threw a cell phone through the broken window into the apartment.

After continuing to smoke crack-cocaine two (2) to three (3) more times, [Leak] put his penis in [Martin's] anus. [Leak] then put his finger inside [Martin's] anus and inside her vagina. During the sexual assaults, [Martin] was wearing only a shirt, her underwear was down at her ankles. The Police contacted [Leak] via the cell phone. The Police persuaded [Leak] to release [Martin]. [Leak] brought [Martin] to the door of the apartment and gave her the knife. [Martin] ran downstairs and dropped the knife.

\* \* \*

[Subsequent] testing showed that three (3) [areas of Martin's shirt] tested positive for human blood, [and one area] tested positive for spermatozoa. [ . . . ] There was a stipulation between defense counsel and the assistant district attorney that [Leak's] DNA was taken and compared to the DNA taken from the spermatozoa on [Martin's] shirt and that the likelihood that the DNA came from anyone other than [Leak] was one in 5.31 septillion[.]

Trial Court Opinion, 6/17/09, at 3–5, 7–8 (record citations omitted).

Subsequent to his sentencing, Leak filed a timely motion for reconsideration of his sentence. The trial court denied that motion on October 16, 2008. This timely appeal followed, in which Leak raises four issues for our review:

I. The trial court erred in denying [Leak's] motion to dismiss pursuant to the Interstate Agreement on Detainers Act because the Commonwealth had 120 days from July 27, 2006 to bring [Leak] to trial after issuing its request directed to federal prison authorities to take [Leak] into custody, or, in the alternative, 180 days from July 27, 2006 to bring [Leak] to trial after the issuance of his request for final disposition in response to the Commonwealth's filing of a detainer with the federal prison authorities with regard to the refiled charges underlying this matter.

II. The trial court erred in denying [Leak's] motion to dismiss pursuant to Rule 600(G) of the Pennsylvania Rules of Criminal Procedure because the 365 day period set forth in that rule for a defendant to be tried prior to dismissal ran from the day of [Leak's] arrest on August 27, 2005 and did not stop running when the Commonwealth wrongfully *nolle prossed* the charges against [Leak] on February 16, 2006 after it failed to exercise due diligence by not bringing [Martin] to Philadelphia from her place of incarceration in Georgia to testify.

III. The trial court erred in denying [Leak's] motion *in limine* to preclude the admission of [Martin's] video-taped preliminary hearing testimony because the Commonwealth failed to file the appropriate motion and give notice of its intention to seek the preservation of that testimony for trial pursuant to Rules 500 and 501 of the Pennsylvania Rules of Criminal Procedure and because the Commonwealth failed to turn over certain discovery to the defense prior to that preliminary hearing thereby denying [Leak] the opportunity for a full and fair cross examination, including the prior criminal record of [Martin] showing her *crimen falsi* conviction, the results of DNA testing performed upon [Martin's] clothing, the statement of eyewitness Melvin Honesty and the medical records from Temple University Hospital documenting [Martin's] diagnosis and treatment at that institution on August 27, 2005.

IV. The trial court erred in admitting [Martin's] medical records from Temple University Hospital into evidence when those records were not given to the defense until almost a year after [Leak's] August 8, 2006 videotaped preliminary hearing and where those records showed no documentation of any sexual penetration but did contain unfairly prejudicial hearsay statements of [Martin] that the defense was never able to cross examine her about.

Leak's Brief at 9–10.

■ Leak's first argument is that the charges against him should have been dismissed because the Commonwealth failed to comply with applicable provisions of the Interstate Agreement on Detainers Act ("IAD"), codified in Pennsylvania at 42 Pa.C.S.A. §§ 9101–08. Our Supreme Court has described the IAD as follows:

The IAD is an agreement between forty-eight states, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States, that establishes procedures for the transfer of prisoners incarcerated in one jurisdiction to the temporary custody of another jurisdiction which has lodged a detainer against a prisoner. Unlike a request for extradition, which is a request that the state in which the prisoner is incarcerated transfer custody to the requesting state, a detainer is merely a means of informing the custodial jurisdiction that there are outstanding charges pending in another jurisdiction and a request to hold the prisoner for the requesting state or

notify the requesting state of the prisoner's imminent release.

*Commonwealth v. Davis,* 567 Pa. 135, 139, 786 A.2d 173, 175 (2001).

We begin our analysis with a brief summary of the relevant procedural history. Leak was arrested for his rape and assault of Martin on August 27, 2005. The Commonwealth withdrew the charges on February 14, 2006 because Martin was in prison in Georgia and also very ill. Two days later, federal authorities took Leak into custody because his arrest in the instant matter constituted a violation of his federal probation. On July 3, 2006, the Commonwealth filed a detainer against Leak while he was in federal custody, thus requiring the federal authorities to notify the Commonwealth when Leak's release was approaching. Leak was released from federal prison on July 27, 2006, and the Commonwealth filed a new complaint and re-arrested Leak on July 29, 2006. Leak pled *nolo contendere* on August 27, 2007, but later withdrew that plea. Leak's trial commenced on June 23, 2008.

Leak argues that the Commonwealth was required, pursuant to Article IV(c) of the IAD, to bring him to trial within 120 days of the date of his release to state custody, and that the Commonwealth's failure to do so should have resulted in the dismissal of the charges.[2] Our Supreme Court addressed this issue in *Davis.* There, the Commonwealth filed a detainer against the defendant while he was in custody in New York but did not file a separate request for temporary custody. *Id.* at 137, 786 A.2d at 174. The Commonwealth obtained custody of the defendant upon the expiration of his prison sentence in New York. *Id.* The defendant sought dismissal because his trial did not commence

within 120 days of his release to the Commonwealth's custody. Our Supreme Court held that Article IV of the IAD is not triggered unless the Commonwealth files a detainer against an individual *and then* files a request for custody of that individual. *Id.* at 140, 786 A.2d at 176. In *Davis,* the Commonwealth did not file a request for custody of the defendant, but simply filed a detainer so that the Commonwealth could assume custody upon the expiration of the defendant's New York sentence. Thus, the Commonwealth did not invoke Article IV of the IAD and was not subject to the 120 day requirement. *Id.*

*Davis* is directly on point and controlling in the instant matter. The record reflects that the Commonwealth filed a detainer while Leak was in federal prison. The Commonwealth did not, however, file a request for custody, but simply awaited the expiration of Leak's federal sentence. Accordingly, the Commonwealth did not trigger Article IV of the IAD and was not subject to the 120 day requirement. Leak's argument fails.

Leak also asserts an argument pursuant to Article III of the IAD. "Article III of the IAD allows a prisoner against whom a detainer has been lodged to request that he or she be transferred to the jurisdiction that filed the detainer and be brought to trial within 180 days of his or her request." *Id.* (citing 42 Pa.C.S.A. § 9101, Article III). Leak, however, failed to include this argument in his Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal.[3] Leak's concise statement addresses his Article IV argument in detail, but makes no mention of an argument under Article III. As a result, Leak has waived

---

2. Article IV is codified at 42 Pa.C.S.A. § 9101.

3. The docket reflects that a trial court order pursuant to Pa.R.A.P. 1925(b) was filed and served on defense counsel.

his Article III argument. Pa.R.A.P. 1925(b)(4)(vii).

■ Leak next argues that the trial court erred in denying Leak's motion to dismiss pursuant to Pa.R.Crim.P. 600(G). Rule 600 provides that, where a defendant is at liberty on bail, trial must commence within 365 days of the date of the criminal complaint. Pa.R.Crim.P. 600(A)(3). Rule 600(G) provides as follows:

(G) For defendants on bail after the expiration of 365 days, at any time before trial, the defendant or the defendant's attorney may apply to the court for an order dismissing the charges with prejudice on the ground that this rule has been violated. A copy of such motion shall be served upon the attorney for the Commonwealth, who shall also have the right to be heard thereon.

If the court, upon hearing, shall determine that the Commonwealth exercised due diligence and that the circumstances occasioning the postponement were beyond the control of the Commonwealth, the motion to dismiss shall be denied and the case shall be listed for trial on a date certain. If, on any successive listing of the case, the Commonwealth is not prepared to proceed to trial on the date fixed, the court shall determine whether the Commonwealth exercised due diligence in attempting to be prepared to proceed to trial. If, at any time, it is determined that the Commonwealth did not exercise due diligence, the court shall dismiss the charges and discharge the defendant.

Pa.R.Crim.P. 600(G).

■ We conduct our review of the trial court's order denying Leak's motion to dismiss as follows:

The proper scope of review [...] is limited to the evidence of record of the [Pa.R.Crim.P.] 600 evidentiary hearing, and the findings of the trial court. An appellate court must view the facts in the light most favorable to the prevailing party. Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind [Pa.R.Crim.P.] 600. [Pennsylvania Rule of Criminal Procedure] 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of [Pa.R.Crim.P.] 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, [Pa.R.Crim.P.] 600 must be construed in a manner consistent with society's right to punish and deter crime.

*Commonwealth v. Surovcik,* 933 A.2d 651, 653–54 (Pa.Super.2007), *appeal denied,* 597 Pa. 715, 951 A.2d 1163 (2008).

Leak argues that the commencement date of the Rule 600 period for purposes of this case is August 27, 2005, the date he was arrested and charged with the rape and assault of Martin. The Commonwealth counters that the Rule 600 period commenced at the filing of the second criminal complaint, as the withdrawal of the original charges was forced by circumstances beyond the Commonwealth's control.

Leak relies on *Commonwealth v. Meadius,* 582 Pa. 174, 870 A.2d 802 (2005), in

which our Supreme Court held that the trial court properly calculated the Rule 600 run date from the date of the original complaint filed by the Commonwealth. In *Meadius*, the prosecutor missed a preliminary hearing to attend a continuing legal education course, and two other preliminary hearings were postponed because Commonwealth witnesses failed to appear. *Id.* at 176, 870 A.2d at 803. The Commonwealth withdrew the charges against the defendant when the trial court refused to grant further continuances and threatened to dismiss the case. *Id.* The Commonwealth subsequently re-filed the charges, but the trial court granted the defendant's Rule 600 motion to dismiss. *Id.* at 178, 870 A.2d at 804. This Court reversed. *Id.*

In reinstating the trial court's order granting dismissal of the charges, our Supreme Court reasoned that the Commonwealth will be allowed the benefit of filing of the second complaint "where the withdrawal and re-filing of charges is necessitated by factors beyond its control. This is consistent with [the text of Rule 600] which specifically adverts to factors beyond the Commonwealth's control." *Id.* at 181, 870 A.2d at 806. The Supreme Court in *Meadius* reasoned that the prosecutor could have arranged to take a CLE course on a different day and that the record failed to reflect that the Commonwealth took reasonable steps to ensure the appearance of its witnesses at the preliminary hearing. *Id.* at 183, 870 A.2d at 808. In light of the Commonwealth's lack of due diligence, the trial court did not err in charging the Commonwealth with responsibility for the delays that led to the withdrawal of the initial complaint against the defendant. *Id.* at 183–84, 870 A.2d at 807–08.

Likewise, in *Surovcik*, this Court concluded that the Commonwealth failed to exercise due diligence where all the evidence offered at the preliminary hearing for the second criminal complaint was available to the Commonwealth prior to its withdrawal of the original complaint. *Surovcik*, 933 A.2d at 657. This Court emphasized that lack of intent to delay on the part of the Commonwealth is not a sufficient basis for denial of a Rule 600 motion. *Id.* at 655. The Commonwealth's failure to exercise due diligence, regardless of any intent to delay, warrants dismissal of charges under Rule 600. *Id.*

The record in the instant matter reflects that the preliminary hearing for the Commonwealth's first complaint was continued six times. One of the six continuances was requested by the defense. N.T. 4/30/07, at 8. Four others were necessitated because Martin, the complaining witness, was believed to be terminally ill with AIDS and could not attend. *Id.* at 5–6. Another was continued because Martin returned to her native Georgia to live with her parents and was incarcerated there on a probation violation.[4] *Id.* at 6; N.T., 6/23/08, at 8.[5] The district attorney from Chatham County Georgia informed Commonwealth authorities in late January of 2006 that Georgia authorities were in the process of determining what sentence Martin would receive for violating her probation, and that Martin could not readily be made available for transfer back to Pennsylvania. N.T., 6/23/08, at 8–9. The Commonwealth withdrew its first complaint against Leak on February 14, 2006, because it was evident that Martin would not be transferred back to Pennsylvania prior to Leak's "must be tried" date. N.T., 4/30/07, at 6.

**4.** The record does not establish when Martin became well enough to travel.

**5.** Leak raised his Rule 600 argument at several hearings leading up to the trial.

We conclude that these facts are easily distinguishable from those of *Meadius* and *Surovcik*. In those cases, the Commonwealth failed to establish that the original charges were withdrawn despite the Commonwealth's due diligence. In *Meadius,* the Commonwealth failed to take sufficient steps to ensure the attendance of its witnesses at the preliminary hearing. In *Surovcik,* the second complaint was based on evidence that the Commonwealth could have procured from an available witness prior to the withdrawal of the original complaint.

In the instant matter, the record reflects that it was impossible for the Commonwealth to procure Martin's testimony prior to the withdrawal of the first complaint. The Rule 600 hearing records establish that Commonwealth was unable to procure Martin's transportation from a Georgia prison in time for Leak's must be tried date, and Leak did not dispute that Martin's illness prevented her from attending four preliminary hearings prior to her incarceration in Georgia. Under these circumstances, we conclude that the trial court acted within its discretion in finding that the withdrawal and re-filing of charges against Leak was not the result of misconduct or lack of due diligence on the part of the Commonwealth. Indeed, given Martin's grave health condition, the Commonwealth had every incentive to procure her testimony as soon as possible. Accordingly, the trial court did not err in rejecting Leak's assertion that the original criminal complaint was the triggering event for the Rule 600 period. Since Leak's Rule 600 argument is based entirely on that assertion, the argument fails.

We next consider Leak's argument that the trial court erred in admitting into evidence the video of Martin's preliminary hearing testimony. In light of Martin's terminal illness, the Commonwealth sought to preserve her testimony by videotape so that it could be used at trial if Martin was unavailable. Rule 500 of the Pennsylvania Rules of Criminal Procedure, which we will address in more detail below, permits videotaped preservation of a witness' testimony in certain circumstances.

Leak's argument for the exclusion of Martin's testimony, as we understand it, is twofold. One argument is that the Commonwealth did not provide sufficient discovery to afford him a full and fair opportunity to cross examine Martin at the preliminary hearing. The other is that the Commonwealth failed to comply with several procedural requirements of Pa. R.Crim.P. 500, including a failure to notify Leak of the Commonwealth's intent to videotape Martin's preliminary hearing testimony. Subsequent to his notice of appeal, Leak filed with this Court a motion for a remand to ascertain, among other things, the extent of the Commonwealth's compliance with Rule 500 and the extent to which the Commonwealth provided discovery in advance of the preliminary hearing. We granted that motion, directing the trial court to conduct a hearing on the Commonwealth's compliance with Rule 500, as well as the extent to which the Commonwealth provided discovery to Leak prior to Martin's testimony. *See* Order, 5/19/10.

 With the benefit of the record from that hearing, we now address the merits of Leak's arguments, beginning with his argument that he did not have pertinent discovery materials prior to Martin's testimony. This argument is essentially a Confrontation Clause argument pursuant to the Sixth Amendment of the United States Constitution and Article I, § 9 of the Pennsylvania Constitution. Both parties briefed it as such. Our Supreme Court has made clear that the admission at trial of previously videotaped testimony de-

pends upon conformity with applicable evidentiary rules and the defendant's constitutional right to confront witnesses against him. *Commonwealth v. Rizzo,* 556 Pa. 10, 14 n. 2, 726 A.2d 378, 380 n. 2 (1999) ("Pennsylvania law permits the admission of prior recorded testimony from a preliminary hearing as an exception to the hearsay rule when the witness is unavailable, the defendant had counsel, and the defendant had a full and fair opportunity for cross-examination at the preliminary hearing.");[6] *see also Commonwealth v. Allshouse,* 604 Pa. 61, 73, 985 A.2d 847, 853 (2009) ("Where testimonial evidence is at issue [...], the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross examination.") (citing *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)); *Commonwealth v. Bazemore,* 531 Pa. 582, 587–88, 614 A.2d 684, 687 (1992)[7] ("Whether prior testimony was given at trial or at any other proceeding, where, as here, admission of that prior testimony is being sought as substantive evidence against the accused, we conclude that the standard to be applied is that of *full and fair opportunity* to cross-examine.") (emphasis in original); Pa.R.E. 804(b)(1).

In *Bazemore,* the defense was unaware that the prosecution's sole witness at the preliminary hearing had given a prior inconsistent statement to the police, had a criminal record, and was under investigation in the same incident for which the defendant was facing charges. *Id.* at 584,

614 A.2d at 685. The witness was central to the prosecution's case, and therefore his credibility was of vital importance. *Id.* at 588–89, 614 A.2d at 687–88. The Supreme Court concluded that the Commonwealth could not introduce the witness' testimony at trial because the defense was deprived of a full and fair opportunity for cross examination. *Id.* at 591, 614 A.2d at 688–89. Citing *Bazemore,* this Court has explained that a defendant asserting a lack of a full and fair opportunity for cross examination must establish that he or she was deprived of "vital impeachment evidence." *Commonwealth v. Cruz–Centeno,* 447 Pa.Super. 98, 668 A.2d 536, 543 (1995), *appeal denied,* 544 Pa. 653, 676 A.2d 1195 (1996).

Leak argues in his brief that the Commonwealth failed to provide four items that were critical to his ability to cross examine Martin:

1. The statement given to police by eyewitness Melvin Honesty [ ('Honesty') ].

2. The medical records of [Martin's] diagnosis and treatment at Temple University Hospital.

3. The results of DNA testing conducted by the Commonwealth showing [Leak's] sperm to have been located on the tail of [Martin's] shirt; and

4. [Martin's] criminal record [...] from the state of Georgia showing her to have a *crimen falsi* record.

Leak's Brief at 37.

We will take each item in turn. With regard to the statement from Honesty, the

---

**6.** *Rizzo* involved the admissibility of testimony under Pa.R.Crim.P. 9015, which has since been renumbered Rule 500.

**7.** The Confrontation Clause has been the subject of several significant federal and state Supreme Court opinions in the recent past, as is evident in our Supreme Court's analysis in *Allshouse.* These cases address the analysis to be applied in discerning whether a witness'

prior statement is testimonial or non-testimonial. Where the prior statement is testimonial, as is the case with Martin's preliminary hearing testimony, our Courts continue to apply the standard originally set forth in *Bazemore* to determine whether the defendant had a full and fair opportunity for cross examination. *See Commonwealth v. Laird,* 605 Pa. 137, 988 A.2d 618, 630 (2010).

prosecutor testified at the remand hearing that he turned over all discovery, including Honesty's statement, as of November 11, 2005. N.T., 6/17/10, at 24–25, 39. Leak's counsel testified that he did not believe he had Honesty's statement prior to the preliminary hearing. *Id.* at 61–62. Rather, defense counsel believed he had a detective's summary of Honesty's statement. *Id.* The discovery control record, introduced as evidence at the remand hearing, did not clarify the matter. The trial court found that Leak's counsel received Honesty's statement prior to the preliminary hearing, based on the prosecutor's testimony and based on questions Leak's counsel posed to Martin at the preliminary hearing. *Id.* at 78–79. Indeed, the preliminary hearing transcript reflects that defense counsel questioned Martin about Honesty's actions while Honesty was present at the scene of the crime. N.T., 8/8/06, at 49–51. Since the record fails to support Leak's contention that he did not have Honesty's statement prior to the preliminary hearing, this argument fails.

█ Second, Leak asserts that he did not have the medical records pertaining to Martin's treatment immediately after the assault. The prosecutor testified that he was not in possession of Martin's hospital records at the time of the preliminary hearing. N.T., 6/17/10, at 27–28. Leak's argument is, therefore, on weak footing under *Bazemore*, as the Supreme Court held in that case that the defendant lacks a full and fair opportunity for cross examination "where the defense has been **denied access** to vital impeachment evidence either at or before the time of the prior proceeding at which that witness testified." *Bazemore*, 531 Pa. at 590, 614 A.2d at 688 (emphasis added). The instant record does not establish that the Commonwealth denied Leak access to the hospital records in question, and Leak does not explain why

he couldn't have subpoenaed the records prior to the preliminary hearing. As we explain below, Leak was on notice that Martin was terminally ill and that the Commonwealth intended to preserve Martin's testimony by videotape. Given this notice, defense counsel had every reason to prepare as if the preliminary hearing would be his only opportunity to cross-examine Martin. "The Commonwealth may not be deprived of its ability to present inculpatory evidence at trial merely because the defendant, despite having the opportunity to do so, did not cross-examine the witness at the preliminary hearing stage as extensively as he might have done at trial." *Cruz–Centeno*, 668 A.2d at 542 (quoting *Commonwealth v. Thompson*, 538 Pa. 297, 311, 648 A.2d 315, 322 (1994), *overruled in part on other grounds, Commonwealth v. Widmer*, 560 Pa. 308, 320, 744 A.2d 745, 752 (2000)).

Moreover, Leak fails to explain how the hospital records constituted vital impeachment evidence. For example, Leak asserts that Martin "implies" in her statements in the hospital records that she was naked when Honesty and police appeared at the scene, but neither Honesty nor the police mentioned that she was naked. Leak's Brief at 38. This argument is deficient in several respects. First, Leak does not explain his basis for believing that Martin's statements recorded in the hospital records imply that she was naked at certain times. Leak's argument is simply a bald assertion unsupported by citation to the record, in violation of Pa.R.A.P. 2119(c). Second, Martin testified that Leak forced her to take her clothes off after Honesty left and forced her to put them back on when the police knocked at the door. N.T., 8/8/06, at 27–30. Martin's testimony is therefore consistent with the absence of any mention of nakedness by Honesty or the police. Finally, the significance of any inconsistency between the

prior testimony of an unavailable witness and a trial witness is a matter for the jury to consider in weighing the evidence. *Commonwealth v. Paddy,* 569 Pa. 47, 78 n. 12, 800 A.2d 294, 313 n. 12 (2002).

Also, Leak asserts that the hospital records did not reveal physical evidence of forced sexual penetration. Leak's Brief at 40–41. This Court has held, however, that the Commonwealth may introduce evidence in a sexual assault case that the absence of physical trauma is not inconsistent with an allegation of sexual abuse. *Commonwealth v. Fink,* 791 A.2d 1235, 1247 (Pa.Super.2002) (citing *Commonwealth v. Minerd,* 562 Pa. 46, 753 A.2d 225 (2000)). Thus, while clearly relevant, we cannot conclude that the absence of this evidence at the preliminary hearing deprived Leak of vital impeachment evidence. Our conclusion is bolstered by the fact that Leak sought to exclude Martin's hospital records at trial. If successful, he would have prevented the jury from learning that the records did not show evidence of forced sexual penetration.

Based on the foregoing, Leak has failed to establish that he was denied access to Martin's hospital records, and he has also failed to establish that those records provided vital impeachment evidence. As such, he has not established a basis for relief under *Bazemore.*

The third item Leak did not possess at the preliminary hearing was the results of DNA testing performed on Martin's shirt.[8] This was because the DNA testing was not complete at the time of the preliminary hearing. N.T., 6/17/10, at 28. Leak testified at trial that he received voluntary oral sex from another woman on the sofa in the room where the assault of Martin took place, and he argues in this appeal that he would have questioned Martin about whether the semen on her shirt could have rubbed off from the sofa.

In this instance, once again, Leak fails to explain how this evidence amounted to vital impeachment evidence. The presence of Leak's semen on Martin's shirt certainly is not inconsistent with her assertion that Leak sexually assaulted her, and therefore its value as impeachment evidence is dubious. Leak had the opportunity at trial to explain his version of events to the jury, and he did so. The differences between Martin's and Leak's versions of events were a matter for the jury to consider in weighing the evidence, but those differences were not a basis for exclusion of Martin's testimony. *Paddy,* 569 Pa. at 78 n. 12, 800 A.2d at 313 n. 12. We cannot conclude that the lack of DNA test results prior to the preliminary hearing deprived Leak of a full and fair opportunity to cross examine Martin.

Finally, Leak complains that he was not aware of Martin's prior *crimen falsi* conviction at the preliminary hearing. The trial court found at the remand hearing that Leak did in fact have Martin's criminal record prior to the preliminary hearing. N.T., 6/17/10, at 78–79. The trial court's finding was based on the prosecutor's testimony and the questions Leak's defense counsel posed at the preliminary hearing. *Id.* The preliminary hearing transcript supports the trial court's finding, as it reflects that Leak's counsel examined Martin about the reasons for her incarceration in Georgia, and she testified that she was incarcerated due to a violation of a sentence of probation that she was serving for a theft conviction. N.T., 8/8/06, at 57–58. Thus, Martin admitted in

---

**8.** The record is silent as to the efforts made by either party to procure DNA testing results in time for the preliminary hearing.

her videotaped testimony that she had a prior *crimen falsi* conviction, and the jury heard that testimony. Since the record conclusively establishes that Leak's counsel cross-examined Martin about the *crimen falsi* conviction, this argument obviously lacks merit.

In light of the foregoing, we conclude that Leak was not denied access to any vital impeachment evidence at the time of the preliminary hearing, and that he had a full and fair opportunity to cross examine Martin. Thus, Leak's argument pursuant to *Bazemore* and its progeny fails.

■ Next, we address Leak's argument that the trial court should have excluded Martin's videotaped testimony from trial because the Commonwealth failed to adhere to the procedural strictures of Rule 500. That Rule provides, in relevant part, as follows:

> Rule 500. Preservation of Testimony After Institution of Criminal Proceedings
>
> (A) By court order.
>
> (1) At any time after the institution of a criminal proceedings, upon motion of any party, and after notice and hearing, the court may order the taking and preserving of the testimony of any witness who may be unavailable for trial or for any other proceeding, or when due to exceptional circumstances, it is in the interests of justice that the witness' testimony be preserved.
>
> (2) The court shall state on the record the grounds on which the order is based.
>
> (3) The court's order shall specify the time and place for the taking of the testimony, the manner in which the testimony shall be recorded and preserved, and the procedures for custody of the recorded testimony.
>
> (4) The testimony shall be taken in the presence of the court, the attorney

for the Commonwealth, the defendant(s), and defense counsel, unless otherwise ordered.

> (5) The preserved testimony shall not be filed of record until it is offered into evidence at trial or other judicial proceeding.

Pa.R.Crim.P. 500.

The record supports Leak's argument that the Commonwealth failed to adhere to the procedure set forth in Rule 500. The docket reflects that the Commonwealth never filed a motion pursuant to Rule 500(A)(1), and the trial court never entered an order on the record as contemplated in Rule 500(A)(3). In addition, the remand hearing makes clear that technical compliance with Rule 500 was lacking. At the remand hearing, the Commonwealth sought to establish technical compliance with the Rule by providing three orders pertaining to the videotaping of Martin's testimony, but these orders were simply municipal court orders permitting the Commonwealth to bring the necessary equipment into the courtroom. N.T., 6/17/10, at 40–41. The orders do not contain any of the information specified in Rule 500(A)(3), and they were presented to the municipal court judge without prior motion or notice to Leak's counsel. *Id.* at 42–44.

On the other hand, the record utterly fails to support Leak's assertion in his brief that the Commonwealth "surprised the defense with its attempt to preserve [Martin's] testimony by means of videotape." Leak's Brief at 34. At the remand hearing, the prosecutor testified that by November 8, 2005, he had informed Leak's counsel that Martin was dying of AIDS and that the Commonwealth intended to videotape Martin's preliminary hearing

testimony. *Id.* at 24–25, 30.[9] By that time, the prosecutor turned over all discovery and told Leak's counsel he would refrain from objecting during Martin's testimony. *Id.*

During Leak's counsel's cross-examination of the prosecutor at the remand hearing, the following exchange took place:

[Leak's Counsel]: What was the main reason why the Commonwealth sought to preserve the preliminary hearing testimony of [Martin]?

[Prosecutor]: In case she died prior to trial.

The Court: Are you serious, Mr. Mungello [ (Leak's counsel) ], really.

[Leak's Counsel]: It's a fact finding hearing, Judge.

The Court: As an Officer of the Court, Mr. Mungello, are you going to sit here and say you were unaware that the preliminary hearing was going to be videotaped?

[Leak's Counsel]: **No.**

The Court: At which point did you become aware that the preliminary hearing was going to be videotaped?

[Leak's Counsel]: Judge, I am not sure, but I know that Mr. Stackow [ (the prosecutor) ] did call me at one point. He called me, but as an Officer of the Court, I will represent to you right now that I did not know anything about [the three municipal court orders] that I just questioned Mr. Stackow about.

The Court: You knew—he told you he was going to set up videotape equipment and tape the hearing, is that correct?

[Leak's Counsel]: **He did tell me that, yes.**

The Court: Okay, go ahead.

[Leak's Counsel]: My best recollection is that he told me that in a telephone message.

The Court: You knew at all times from the very beginning of these preliminary hearings that this testimony was going to be videotaped.

[Leak's Counsel]: **I am not even—I would never even contest that. Would never even contest that. Absolutely. He told me in at least a telephone message initially, and then I am sure we had at least one further discussion of it, as we would talk in the hallway about the case.**

The Court: And you knew why it was going to be videotaped, because the witness was terminally ill? You knew that?

[Leak's Counsel]: **He did tell me that.**

*Id.* at 45–46 (emphasis added). Based on the foregoing, Leak clearly could not have been "surprised" by the Commonwealth's intent to videotape Martin's testimony. Leak's assertion to the contrary in his brief is simply a misrepresentation of fact.

Thus, despite the Commonwealth's failure to file a Rule 500 motion, the record reflects that Leak had notice that Martin's testimony would be videotaped. Further, while there was no specific Rule 500 hearing, the preliminary hearing transcript demonstrates that the trial court allowed the videotaped hearing to go forward only after some on-the-record argument and a sidebar. N.T., 8/8/06, at 4–6.

We are therefore faced with a situation in which the Commonwealth failed to adhere to the procedural strictures of Rule 500, but nonetheless provided Leak's counsel with notice of its intent to videotape the hearing at least nine months before the hearing took place. Few published cases address Rule 500, and neither the Rule

---

**9.** Martin did pass away prior to the trial.

itself nor any published decision specifies a remedy for the Commonwealth's failure to adhere to its procedures.[10]

Leak acknowledges in his brief that Rule 500 includes no provisions governing the admissibility of videotaped evidence, and that the admissibility of evidence is left to the discretion of the trial court. Leak's Brief at 32. This Court reviews a trial court's decision to admit evidence for abuse of discretion. *Commonwealth v. Bozyk*, 987 A.2d 753, 756 (Pa.Super.2009). We have no basis on which to apply a different standard in this case.

We observe that nothing in the record indicates that the absence of a Rule 500 motion, hearing, and order has prejudiced Leak in any way. He was notified well in advance of the preliminary hearing, and, as set forth above, was afforded a full and fair opportunity to cross examine Martin. Leak does not assert the existence of any flaw in the videotaping procedure (*see* Rule 500(A)(3)), does not dispute that all parties were present at the hearing (*see* Rule 500(A)(4)), and he does not raise any issue with regard to the chain of custody of the videotape (*see* Rule 500(A)(5)).[11] By all appearances, the videotaping procedure went forward without any technical difficulties and the videotape played for the jury was an accurate depiction of Martin's preliminary hearing testimony. Nothing in the record supports a contrary conclusion.

With this in mind, we refer once again to *Bazemore*, where our Supreme Court wrote as follows:

> The real basis for the admission of testimony given by a witness at a former trial is to prevent the miscarriage of justice where the circumstances of the case have made it unreasonable and unfair to exclude the testimony. It naturally follows that testimony from the former trial should not be admitted if to do so would result in a miscarriage of justice.

*Bazemore*, 531 Pa. at 587, 614 A.2d at 686.

Though *Bazemore* did not involve admission of videotaped testimony pursuant to Rule 500, we find this quoted passage instructive. Since Leak was afforded a full and fair opportunity to cross examine Martin, and since the Commonwealth's technical noncompliance with Rule 500 did not result in any prejudice, we conclude that a miscarriage of justice would result from excluding Martin's testimony, not from its admission. The trial court did not abuse its discretion in admitting Martin's videotaped testimony into evidence at trial. Leak's Rule 500 argument fails.

In his final issue, Leak asserts that the trial court erred in admitting Martin's hos-

---

**10.** In *Rizzo*, the issue was whether "exceptional circumstances" existed to justify videotaping of testimony pursuant to Rule 500(A)(1). *Rizzo*, 556 Pa. at 13–14, 726 A.2d at 379–80. The Supreme Court's analysis in *Rizzo* therefore does not provide guidance as to a remedy for the Commonwealth's technical noncompliance with Rule 500.

Leak never contested the existence of exceptional circumstances until his brief on appeal, which contains a single paragraph baldly asserting that such circumstances did not exist in this case. This is waived, as it cannot be raised for the first time on appeal. Pa.R.A.P.

302(a). Moreover, the instant record makes abundantly clear that Martin was terminally ill with AIDS at the time of the preliminary hearing, and that she passed away prior to Leak's trial.

**11.** We observe, also, that Rule 501 of the Rules of Criminal Procedure sets forth an additional litany of procedures to be followed at a videotaped hearing. Leak mentions Rule 501 in passing in his brief, but he does not assert which, if any, portion of Rule 501 was not adhered to or how he suffered prejudice as a result.

pital records into evidence and allowing the jury to review the records during deliberations. Leak fails to cite any pertinent law in support of his final argument and thus has waived it.[12] Pa.R.A.P. 2119(b); *Commonwealth v. Natividad,* 595 Pa. 188, 239, 938 A.2d 310, 340 (2007).

Since we have concluded that each of Leak's arguments either lacks merit or is waived, we affirm the judgment of sentence.

Judgment of sentence affirmed.

---

**12.** In his brief, Leak cites only to Pa. R.Crim.P. 646(C), which provides that the jury is not permitted to have transcripts of trial testimony, a copy of a defendant's confession, a copy of the information, and jury instructions. Pa.R.Crim.P. 646(C). Since nothing in Rule 646(C) forbids the jury to have a victim's hospital records, that Rule does not constitute pertinent authority in support of Leak's argument.