J-A30016-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILLIAM A. TILLAR, | : | |
| | : | |
| Appellant. | : | No. 1473 WDA 2017 |

Appeal from the Judgment of Sentence, August 22, 2017,
in the Court of Common Pleas of Washington County,
Criminal Division at No(s): CP-63-CR-0000375-2016.

BEFORE:   SHOGAN, J., KUNSELMAN, J., and STRASSBURGER*, J.

MEMORANDUM BY KUNSELMAN, J.:                     **FILED MARCH 15, 2019**

William A. Tillar (Tillar) appeals from a judgment of sentence imposed after a jury convicted him of possession with intent to deliver, receiving stolen property, possession of a firearm prohibited, firearms not to be carried without a license, possession of drug paraphernalia, and fleeing or attempting to elude a police officer.[1]  The court sentenced Tillar to 11 to 22 years in prison.  On appeal, Tillar presents a variety of legal challenges that arise out of each stage of his case: the preliminary hearing, the jury trial, and the post-trial motions. After careful review, we affirm.

On the night of August 5, 2015, Pennsylvania State Police Trooper Raymond Harding observed a white Cadillac with heavily tinted windows and

---

[1] 35 Pa.C.S.A. § 780-113(a)(30); 18 Pa.C.S.A. § 3925(a); 18 Pa.C.S.A. § 6105(a)(1); 18 Pa.C.S.A. § 6106(a)(1); 35 Pa.C.S.A. § 780-113(a)(33); and 75 Pa.C.S.A. § 3733(a)

---

*   Retired Senior Judge assigned to the Superior Court.

a burned out light. When Trooper Harding ran the plates, no information was available regarding the owner. Trooper Harding attempted to stop the Cadillac, but the driver refused to stop and Trooper Harding gave chase. The chase ended when the Cadillac pulled into a residential driveway. The car continued behind the house and out of the Trooper's line of sight.

As Trooper Harding approached the vehicle from around the side of the house, he heard a car horn beep and a car door close. With the car windows tinted, Trooper Harding ordered everyone out of the car. Two passengers emerged and surrendered: Jeffrey Carson and Jonathan Tillar, Appellant's brother (Jonathan). A K-9 search of the grassy area near the vehicle revealed a small child's shoebox and a Ziploc bag. In the shoebox was $220 and a semi-automatic pistol. In the Ziploc bag were 200 stamp bags of heroin. No one was in the driver seat.

Jonathan informed the police that his brother, Appellant William Tillar, was the driver and that Tillar fled when the car stopped. The car belonged to Tillar's paramour, Alyssia Jennings. Jonathan testified against Tillar at the preliminary hearing in exchange for the withdrawal of Jonathan's charges. Jonathan died before the start of the criminal trial. At the trial, the court admitted Jonathan's former testimony, but the court excluded a letter Jonathan allegedly wrote recanting the same. Tillar was convicted.

While awaiting sentencing, Tillar filed a post-verdict motion for new trial, alleging that he discovered new evidence. The after-discovered evidence was testimony from a man named Eric "E" Johnson. Tillar claimed that Eric

Johnson, a fellow inmate at the Washington County Correctional Facility, saw Jonathan driving the Cadillac with Carson early in the night – and that Tillar was not there. Johnson indicated that he gave Carson $250 in a shoebox, which Johnson claimed was the repayment of a loan. Johnson further advised that later that same evening he received a call from Carson, who asked him to call Alyssia Jennings and direct her to report to police that her car had been stolen, which she refused to do.

After sentencing, Tillar also filed a motion for a new trial claiming the conviction was against the weight of the evidence. The court denied him relief.

Tillar filed this timely appeal. He presents four issues for our review:

> 1. Did the trial court err in admitting the preliminary hearing testimony of his brother, Jonathan?
>
> 2. Did the trial court err in refusing to admit exculpatory evidence offered by Tillar, where that evidence was properly authenticated and admissible?
>
> 3. Did the trial court err in denying Tillar met his burden of proof for a new trial where he presented after-discovered evidence?
>
> 4. Did the trial court err in denying Tillar's post-sentence motion for a new trial where the verdict was against the weight of the evidence?

*See* Tillar's Brief at 7.

Tillar first challenges the admission of Jonathan's testimony given at the preliminary hearing. The testimony was vital to the conviction. Without Jonathan implicating Tillar as the driver, the sufficiency of the evidence would be in doubt.

Tillar's position is essentially a Confrontation Clause argument pursuant to the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution. ***See Commonwealth v. Leak***, 22 A.3d 1036, 1043 (Pa. Super. 2011). Under both our federal and state constitutions, a criminal defendant has a right to confront and cross-examine witnesses against him. ***See*** U.S.C.A. Const. Amend. 6; ***see also*** Const. Art 1, § 9; ***and see Commonwealth v. Bazemore***, 614 A.2d 684, 685 (Pa. 1992). However, it is well established that an unavailable witness's prior recorded testimony from a preliminary hearing is admissible at trial and will not offend the right of confrontation, provided the defendant had counsel and a full opportunity to cross-examine that witness at the prior proceeding. ***See, e.g., Leak,*** 22 A.3d at 1044.

Where testimonial evidence is at issue, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross examination. ***Id.*** (Citing ***Commonwealth v. Allshouse***, 985 A.2d 847, 853 (Pa. 2009)); ***see also Crawford v. Washington***, 541 U.S. 36 (2004).

Functionally speaking, these principles are ensconced in Pennsylvania Rule of Evidence 804 (Exceptions to the Rule Against Hearsay – When the Declarant is Unavailable as a Witness). ***See*** Pa.R.E. 804(a)(4); (b)(1).

Here, there is no question the witness was unavailable. Not surprisingly, Pa.R.E. 804(a)(4) recognizes death as a cause of unavailability sufficient to render a declarant's former testimony admissible at a subsequent trial. The focus is whether Tillar had a full and fair opportunity to examine the witness

(his since-deceased brother Jonathan) at the preliminary hearing. *See* Pa.R.E. 804(b)(1); *see also Bazemore, supra*, 614 A.2d at 687.

Tillar narrows our focus even further. He cites our decision in *Commonwealth v. Cruz-Centeno*, 668 A.2d 536 (Pa. Super. 1995). There, we held:

> Where the defense, at the time of the preliminary hearing, was *denied access to vital impeachment evidence*, *such as prior inconsistent statements of the witness or the witness's criminal record*, a full and fair opportunity to cross-examine the unavailable witness may be deemed to have been lacking at the preliminary hearing.

*Id.*, 668 A.2d at 542-543 (emphasis added).

Tillar claims that the Commonwealth denied him access to vital impeachment evidence. Specifically, Tillar claims the Commonwealth had not disclosed: 1) Jonathan's prior inconsistent statement made to the police; 2) the specifics of Jonathan's cooperation agreement with the Commonwealth; or 3) any discovery in the matter which would allow Tillar's counsel to properly explore the "fabrications and inconsistences" in Jonathan's testimony. *See* Tillar's Brief at 23. We discuss each point in turn.

Regarding the alleged prior inconsistent statements, Tillar points to the police interrogation with Jonathan on the night of the incident. *See* Tillar's Brief at 24. During the interrogation, Jonathan admitted to using heroin but denied using heroin that day. During the preliminary hearing, however, Jonathan testified that he used both pills and heroin on the day in question.

The other alleged inconsistency concerned the day's itinerary. During the interrogation, Jonathan stated that the plan was to go to Washington, Pennsylvania to meet some women. Later in the interrogation, Jonathan stated that the plan was to meet some women and go to the Meadows Casino. Then Jonathan claimed that the only reason he was with Tillar was to get a phone. He further mentioned several stops the car made throughout the night: the casino, a bar, a liquor store and possibly a park. During the preliminary hearing, Jonathan testified that the only reason he was with Tillar was to get a phone. Jonathan testified about the stops at the liquor store and the park, but he did not mention meeting up with women, nor the casino, nor the bar.

Tillar argues that his counsel could not question Jonathan about these inconsistences, or the women they were with, or how long they were at each stop, "among other things." *See* Tillar's Brief at 26. We disagree with Tillar's categorization of these differences as "prior inconsistences."

It is well settled that an omission is not the same as an inconsistency. Mere dissimilarities or omissions in prior statements do not suffice as impeaching evidence; the dissimilarities or omissions must be substantial enough to cast doubt on a witness's testimony to be admissible as prior inconsistent statements. ***Commonwealth v. Luster***, 71 A.3d 1029, 1043 (Pa. Super. 2013) (*en banc*) (citations omitted).

As the Commonwealth observes, Jonathan never changed his story about who was in the car, who drove it, who owned it, and whom he saw with

- 6 -

the shoebox. To the extent that the timeline of events is vague, such ambiguity does not cast doubt on the witness's testimony generally, nor his specific testimony regarding Tillar's culpability. Put plainly, the omissions do not rise to the level of inconsistent statements.

Next, Tillar argues that he was not afforded a full and fair opportunity to cross-examine Jonathan because he was not given Jonathan's criminal record. *See* Tillar's Brief at 27. Tillar notes that Jonathan was convicted for a crime of falsehood on at least one prior occasion. Apparently Tillar means that he could not impeach his brother's testimony pursuant to Pennsylvania Rule of Evidence 609 (Impeachment by Evidence of a Criminal Conviction) because the Commonwealth did not tell him about it. For support, Tillar cites ***Bazemore, supra***, and ***Commonwealth v. Smith***, 647 A.2d 907, 913 (Pa. Super. 2003).

We agree in part with Tillar's understanding of ***Bazemore***. The prosecution's failure to reveal a witness's prior criminal record could equate to a withholding of vital impeachment evidence, which, in turn, could rob the defense of a full and fair opportunity to cross-examine the witness. ***See*** Tillar's Brief at 28; ***see also Bazemore***, 614 A.2d at 687. Moreover, we agree with Tillar that a stipulation of a witness's prior record is not necessarily enough to pass constitutional muster. ***See Smith***, 647 A.2d at 912.

But as the progeny case law clarifies, the witness's criminal record is only "vital impeachment evidence" when it speaks to the witness's motivation for testifying for the prosecution. Whenever a witness may be biased in favor

of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him within the same jurisdiction, that possible bias, in fairness, **must** be made known. **See id.** The defendant has the right to explore the possibility of any coercive power that the Commonwealth might have had over the witness, which may have been an incentive for the witness to testify favorably for the Commonwealth. **See id.** at 914.

We explained this nuance in **Cruz-Centeno**, **supra**:

> In **Commonwealth v. Bazemore**, **supra**, at the time of the preliminary hearing, the Commonwealth was considering charging the unavailable witness with crimes, including homicide charges, which arose out of the same incident giving rise to the charges against the defendant.
>
> And, in **Commonwealth v. Smith**, **supra**, the unavailable witness was a confidential informant with a history of having criminal charges against him dismissed. Thus, in both **Bazemore** and **Smith**, the prior records of the unavailable witnesses unambiguously suggested ulterior motives for testifying, and, the failure of the Commonwealth to disclose such information denied the defendants in those cases a full and fair opportunity to cross-examine the unavailable witnesses at their preliminary hearings.

**Cruz-Centeno**, 668 A.2d at 544.

Thus, Tillar's claim that Jonathan's criminal record was vital impeachment evidence depends on whether Jonathan's criminal record suggested an ulterior motive for his testimony. As we develop in more detail below, we conclude here that Jonathan's prior falsehood crime did not suggest

an ulterior motive for his testimony, and thus it did not have to be disclosed by the Commonwealth.

Our complete resolution of this criminal history question bleeds into Tillar's next contention: Tillar claims that the Commonwealth never disclosed that Jonathan made a cooperation agreement to have his criminal charges withdrawn. If true, we would agree with Tillar that he did not have a full and fair opportunity to cross-examine his brother. Here is where Jonathan's criminal record – namely, his pending charges – suggests ulterior motivations.

Contrary to Tillar's argument, the record reveals that Tillar was well aware that his brother faced criminal charges stemming from the same incident and that if Jonathan testified truthfully for the prosecution, Jonathan's charges would be withdrawn. At the beginning of Jonathan's direct examination, Jonathan's attorney stated, "Per a cooperation agreement, he has agreed to testify." *See* N.T. Preliminary Hearing, 2/16/16, at 49.

To be clear, Jonathan initially *denied* that the Commonwealth offered him anything in exchange for his testimony. *Id.* at 80. But during the Commonwealth's re-direct examination, Jonathan clarified that he understood that the charges would be withdrawn if he testified. *See id.* at 107-108.

Tillar argues that he only learned of the agreement's existence on re-direct, not *prior* to cross-examination. In Tillar's view, this created a violation under *Bazemore*. Tillar ignores the fact that he was made aware of the cooperation agreement at the beginning of the Commonwealth's direct examination, which allowed Tillar to fully question his brother about the

agreement on the initial cross-examination. *See id.* at 49. Once the brother admitted to having a cooperation agreement, Tillar then had a second opportunity to press the issue on re-cross. At this juncture, Tillar chose not to engage further. *See id.* at 108. We decline to liken Tillar's missed opportunity with the deprivation of opportunity.

We conclude that Tillar had a fair and full opportunity to question the witness with the "vital impeachment evidence," *i.e.*, the cooperation agreement. The Commonwealth had no responsibility to reveal the brother's criminal record beyond what criminal liability the brother faced if he did not testify truthfully. Tillar was presented with an opportunity to "explore the possibility of any coercive power that the Commonwealth might have had" over the witness. **See Smith**, **supra**, 647 A.2d at 914. Contrary to his position, Tillar was not foreclosed from exploring Jonathan's potential bias.

Rounding out his first appellate issue, Tillar sets forth one final reason that he was deprived of a full and fair opportunity to cross-examine his brother. Tillar contends that his brother's "testimony varied so widely and changed so much throughout the [preliminary] hearing that to fully cross-examine him required putting his [brother's] testimony in the context of other information that would not be disclosed until discovery was completed." **See** Tillar's Brief at 32. In essence, Tillar claims it was impossible to cross-examine his brother until the trial.

For support, Tillar relies solely on a 30-year-old United States Supreme Court decision about an entirely different subject matter. In his brief, Tillar

quotes ***Perry v. Leeke***, 488 U.S. 272, 282 (1989): "Cross-examination often depends for its effectiveness on the ability of counsel to punch holes in a witness' testimony at just the right time, in just the right way."

In this passage, the Supreme Court was in the middle of explaining why cross-examination should take place immediately after direct examination, and how trial courts must be allowed to maintain an equal playing field if a brief recess is taken. The Court stated: "Permitting a witness, including a criminal defendant, to consult with counsel after direct examination but before cross-examination grants the witness an opportunity to regroup and regain a poise and sense of strategy that the unaided witness would not possess." ***Id.*** The Court reasoned that basic fairness suggests that the story presented on direct can only be measured for its accuracy by uninfluenced testimony on cross. ***Id.*** at 283. And so if a trial court permitted a brief recess between direct and cross examinations, it follows that the trial court should be allowed to prevent the witness from consulting the attorney so as to maintain this balance of fairness. ***Id.***

Tillar's argument has taken us a great distance from the pertinent inquiries. Clearly ***Perry v. Leeke*** has nothing to do with the instant matter. Tillar provides no other authority to support his theory that the witness's testimony was so complex that he could not possibly cross-examine him unless Tillar first ascertained the fruits of discovery.

We conclude that Tillar had a full and fair opportunity to cross-examine the witness. His first appellate issue is meritless.

In his second appellate issue, Tillar argues the court erred when it excluded evidence at trial. *See* Tillar's Brief at 41. There, the court concluded that a letter, allegedly written by Jonathan to Tillar, was inadmissible for lack of proper authentication. *See* Pa.R.E. 901 ("Authenticating or Identifying Evidence"). In the purported letter, Jonathan apologizes to Tillar for implicating him. Jonathan writes that "E" was the driver of the car and that he only testified for the prosecution because the police threatened him. The letter is signed "Jon." "Sosa," Jonathan's nickname, is also printed next to "Jon." The Commonwealth argues that the letter was fraudulent. *See* Commonwealth's Brief at 47. On appeal, Tillar claims that he met the low burden of proof that Pa.R.E. 901 establishes.

Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. *Commonwealth v. Mosley*, 114 A.3d 1072, 1081 (Pa. Super. 2015).

Pennsylvania Rule of Evidence 901 provides that authentication is required prior to admission of evidence. The proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be. *See* Pa.R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be can be sufficient. *See* Pa.R.E. 901(b)(1).

> A document may be authenticated by direct proof and/or circumstantial evidence. Proof of any circumstances which support a finding that the writing is genuine will suffice to authenticate the writing. Where there is a question as to any writing, the opinion of any person acquainted with the

handwriting of the supposed writer is relevant for that purpose. [Pa.R.E.] 901(b) provides that a non-expert's opinion that handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation is complete evidence.

*Gregury v. Greguras*, 196 A.3d 619, 633 (Pa. Super. 2018) (*en banc*) (citations and quotation marks omitted).

In addition, circumstantial evidence may be sufficient to authenticate a document. *Id.* Letters may be authenticated by contents known only to the sender and recipient. *See id.* (citation omitted).

A proponent of a document needs to present only a *prima facie* case of some evidence of genuineness in order to put the issue of authenticity before the factfinder. *Id.*, 196 A.3d at 633-634 (citation omitted).

In the instant matter, Tillar sought to authenticate Jonathan's letter through Alyssia Jennings' testimony. Jennings testified that the brothers had very similar handwriting. She concluded that, while she was not "100% sure" the handwriting was Jonathan's, it was definitely not Tillar's. *See* N.T. Jury Trial, 1/11-12/2017, at 304. However, Jennings had no knowledge of the letter's preparation, its mailing or the approximate date when the letter was written. Jennings testified that she had not witnessed Jonathan write anything for a year or two.

Fatally, Jennings could not recognize the handwriting of another exhibit; it was Jonathan's handwritten statement to the police. *See* Exhibit S. Jonathan wrote the statement at the state police barracks after being arrested

on the night in question. Jonathan's writing was captured by an audio and visual recording statement.

Although the burden is a low one, we agree with the trial court that Tillar failed to meet it. Contained in the record are Jonathan's authenticated handwriting (Exhibit S) and his non-authenticated handwriting (the excluded Exhibit 2). While we and trial court observe that the difference between the two samples is stark, we are cognizant that this job is usually one for the factfinder – here, the jury. This is only true, however, if the interested party established a *prima facie* case. Tillar had no direct proof, so he had to rely on circumstantial evidence. But his witness could not even recognize Jonathan's other writing sample (Exhibit S), which was undeniably his because he created it while being video and audio recorded. When given the opportunity, Jennings displayed a lack of familiarity with Jonathan's handwriting, per Pa.R.E. 901. The trial court did not abuse its discretion in ruling that the letter was inadmissible.

Tillar's third appellate issue is whether trial court erroneously denied his post-verdict motion for a new trial because Tillar obtained after-discovered evidence. The purported after-discovered evidence was Eric Johnson's account that he observed Jonathan, but not Tillar, in the Cadillac on the night in question.

Unless there has been a clear abuse of discretion, an appellate court will not disturb the trial court's denial of an appellant's motion for new trial based

on after-discovered evidence. ***Commonwealth v. Chamberlain***, 30 A.3d 381, 416 (Pa. 2011).

A trial court may grant a post-sentence motion for a new trial based on after-discovered evidence if the appellant shows by a preponderance of the evidence that the after-discovered evidence (1) could not have been obtained prior to trial by exercising reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach a witness's credibility; and (4) would likely result in a different verdict. ***Commonwealth v. Griffin***, 137 A.3d 605, 608 (Pa. Super. 2016) (citing ***Commonwealth v. Castro***, 93 A.3d 818, 821 n.7 (Pa. 2014) (citation omitted)). The test is conjunctive; an appellant must show each of these prongs has been met. ***Id.***

We conclude that Tillar has not met every prong.

The first question is whether Tillar could have ascertained Eric Johnson's account prior to trial by exercising reasonable diligence. We have expounded upon this element in detail.

> To obtain a new trial based on after-discovered evidence, the petitioner must explain why he could not have produced the evidence in question at or before trial by the exercise of reasonable diligence. A defendant may unearth information that the party with the burden of proof is not required to uncover, so long as such diligence in investigation does not exceed what is reasonably expected. [D]ue diligence requires that defendant act reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and facts known to him. Thus, a defendant has a duty to bring forth any relevant evidence on his behalf. A defendant cannot claim he has discovered new evidence simply because he had not been expressly told of that evidence. Likewise, a defendant who fails to question or

investigate an obvious, available source of information, cannot later claim evidence from that source constitutes newly discovered evidence. The concept of reasonable diligence is particularly relevant where the defendant fails to investigate or question a potential witness with whom he has a close, amicable relationship. Absent a plausible explanation for the failure to discover the evidence earlier, evidence obtained after trial should not be deemed 'after-discovered'; to allow the defendant to claim information actually or constructively within his knowledge and available to him is after-discovered.

***Commonwealth v. Padillas***, 997 A.2d 356, 363-364 (Pa. Super. 2010) (citations and some quotations omitted).

At the trial, the Commonwealth produced letters written by Tillar. ***See*** Exhibits K, L. Tillar wrote the letters after incident, but before the preliminary hearing. In the letters, Tillar encouraged Jonathan to "stay strong," because Tillar could not be convicted without Jonathan's testimony. ***Id***. Tillar explained to Jonathan that Alyssia Jennings, Tillar's paramour, told police that "E" called and told her to report the Cadillac stolen. ***See*** Exhibit L. Tillar also suggested to his brother that "E" was the driver on the night in question. By Tillar's own words, he was aware, prior to trial, that a person named "E" was involved.

At the post-trial hearing, Eric Johnson testified that he knew Tillar and Jonathan since 2006. Johnson testified that he and Tillar occasionally hung out together, that they served time together in 2011, and that Tillar referred to Johnson by his street name "E." Tillar had constructive knowledge, if not actual knowledge, that "E" was his acquaintance Eric Johnson. Tillar failed to investigate an obvious, available source. His claim that he did not know who

"E" was is not a plausible explanation. Not only did Tillar know who Eric "E" Johnson was, but if Tillar's questionable letters were to be believed, Tillar knew that Johnson should have been the one facing his charges. Tillar, of course, did not breathe a word of this until after his conviction. Eric Johnson's testimony could have been ascertained prior to trial had Tillar exercised reasonable diligence.

The next two prongs of the after-discovered inquiry concern the purpose of Eric Johnson's testimony. If the testimony was merely corroborative or cumulative, or if the testimony will only be used to impeach a witness's credibility, then the testimony will not beget a new trial. **See Griffin**, 137 A.3d at 608.

We need not adjudge whether Tillar has met these second and third prongs, as his argument already failed to meet the first. Notwithstanding these inquiries, however, we also conclude that even if Eric Johnson's testimony was truthfully presented at trial, Tillar still cannot meet the fourth and final prong.

The final prong tests whether the after-discovered evidence would have likely changed the result:

> Finally, before granting a new trial, a court must assess whether the alleged after-discovered evidence is of such nature and character that it would likely compel a different verdict if a new trial is granted. In making that determination, a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction. [C]onflicting accounts are inherently unreliable and would not compel different verdict in new trial. [C]ases that have addressed newly-discovered evidence

- 17 -

have focused not simply on the credibility of the person offering the exculpatory evidence, but on the credibility or trustworthiness of the evidence itself, as well as the motive, or other impeaching characteristics, of those offering it.

*Padillas*, 997 A.2d at 365 (citations omitted).

Tillar characterizes Eric Johnson's account as unbiased, whereas Jonathan's testimony "came with a get-out-of-jail-free-card." *See* Tillar's Brief at 37. Although Tillar described Eric Johnson as an eyewitness, he forgets that Tillar's brother was also an eyewitness. Moreover, the court described Johnson's testimony as "evasive, confusing, self-contradictory" and "willfully false." *See* Memorandum and Order, dated July 20, 2017, at 10-11. The court concluded the manner of his testimony to be "akin to that of Pinocchio." *Id.*, at 11.

Notwithstanding Johnson's lack of credibility, we also share the court's observation that his testimony does not directly contradict Jonathan's identification of Tillar as the driver of the Cadillac at the time of the offenses. Given the unconvincing nature of the after-discovered evidence, we conclude that Tillar's argument for a new trial must fail under the fourth prong as well. The trial court properly denied Tillar's requested relief.

In Tillar's fourth and final appellate issue, he argues the court erred in refusing to grant a new trial on the basis that the jury's verdict opposed the weight of the evidence. *See* Tillar's Brief at 43-45.

In ruling on a claim challenging evidentiary weight, the trial court must accord great deference to the jury's discretion to adjudge the credibility of

witnesses and to determine whether their testimony, if believed, establishes the elements of the offenses charged. **Commonwealth v. Stays**, 70 A.3d 1256, 1267 (Pa. Super. 2013). So long as that evidence is legally sufficient, the trial court may grant a new trial on evidentiary weight only in the most limited of circumstances:

> The weight given to trial evidence is a choice for the factfinder. If the factfinder returns a guilty verdict, and if a criminal defendant then files a motion for a new trial on the basis that the verdict was against the weight of the evidence, a trial court is not to grant relief unless the verdict is so contrary to the evidence as to shock one's sense of justice.

*Id.* (Citations omitted).

As an appellate court, our standard of review is more attenuated still, as we may adjudge only the trial court's exercise of discretion in entertaining the appellant's challenge:

> When a trial court denies a weight-of-the-evidence motion, and when an appellant then appeals that ruling to this Court, our review is limited. It is important to understand we do not reach the underlying question of whether the verdict was, in fact, against the weight of the evidence. We do not decide how we would have ruled on the motion and then simply replace our own judgment for that of the trial court. Instead, this Court determines whether the trial court abused its discretion in reaching whatever decision it made on the motion, whether or not that decision is the one we might have made in the first instance.

*Id.* at 1267-1268 (citations omitted).

Mindful of our standard of appellate review and its exceptionally narrow scope, we find no basis for relief. In response to Tillar's post-sentence motion,

the trial court examined the weight of the evidence and found no deficiency in the Commonwealth's case. Tillar argues that the conviction was "based entirely on the inconsistent, self-serving and unbelievable testimony of Jonathan." *See* Tillar's Brief at 43. As we discussed above, Jonathan's eyewitness testimony was not inconsistent, nor unbelievable. The jury was free to weigh Jonathan's motivation for his preliminary hearing testimony. Meanwhile, Tillar ignores his own letters encouraging Jonathan not to cooperate and to identify "E" as the driver. He also ignores the fact that the car belonged to his paramour. The trial court concluded that the verdict did not shock its sense of justice. Based on this record, we can conceive no basis on which to question that assessment. Accordingly, we find no basis for relief on Tillar's challenge to the weight of the evidence supporting any of his convictions.

For the reasons above, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/15/2019